638 F.2d 790
 SCOTT PAPER COMPANY, a Pennsylvania Corporation,
International Paper Company, a corporation, St.
Regis Paper Co., a corporation, Koppers
Company, Inc., a corporation,
Plaintiffs-Appellants,
v.
TASLOG, INC., an Alabama Corporation, Defendant-Appellee.
 No. 79-3524.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 March 2, 1981.
 Marshall J. DeMouy, Edward G. Hawkins, Mobile, Ala., for plaintiffs-appellants.
 William L. Smith, John M. Grower, Jackson, Miss., James E. Hart, Jr., Brewton, Ala., for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 Scott Paper Company, International Paper Company, St. Regis Paper Company, and Koppers Company own large tracts of land encumbered by an oil and gas royalty owned by Taslog, Inc. A dispute arose between the appellant paper companies and Taslog over whether Taslog's royalty burdened the entire gas stream produced from appellants' wells, including hydrogen sulfide gas, or whether it was limited to merely the hydrocarbon elements of the gas stream. To resolve this dispute, the paper companies instituted a declaratory judgment action and, after the submission of stipulated facts and affidavits, both sides moved for summary judgment. The District Court for the Southern District of Alabama granted Taslog's motion for summary judgment, and the paper companies appealed. We affirm the district court.
 
 
 2
 The evidentiary facts are not in dispute. Prior to 1949, the Alger-Sullivan Lumber Company owned in fee simple approximately 225,000 acres of land in Butler, Conecuh, Escambia, and Monroe Counties, Alabama, and Escambia County, Florida (the "mineral lands"). On July 15, 1949, Alger-Sullivan executed twelve separate oil and gas leases covering approximately eighty-five percent of its property to the Stanolind Oil and Gas Company. These leases, which were identical except for the property description, were for a term of five years and as long thereafter as oil, gas, or other minerals were produced. Under the terms of the Stanolind leases, Alger-Sullivan retained a royalty on (1) "one-eighth part of oil produced and saved from the leased premises," (2) one-eighth part of "gas including casinghead gas or other gaseous substance, produced from said land," and (3) "$.50 for each long ton of sulphur produced and marketed from the land" and one-tenth the value of "all other minerals mined and marketed." Stanolind did not complete a producing well within the prescribed time, and therefore the leases expired by their own terms.
 
 
 3
 On October 27, 1952, while the Stanolind leases were still in effect, Alger-Sullivan by separate "Royalty Dividend Deeds" distributed to each of its sixty-seven shareholders their proportionate share of a perpetual, non-participating royalty on all oil and gas under its lands. Each of the sixty-seven Royalty Dividend Deeds was identical except for the name of the grantee and the size of the fractional interest being conveyed. The royalty granted to the Alger-Sullivan shareholders in the dividend deeds was essentially identical to the royalty retained by Alger-Sullivan in the Stanolind leases:
 
 
 4
 (a) On oil, the equal one-eighth (1/8) part ... of all oil produced and saved from the premises ...
 
 
 5
 (b) On gas including casinghead gas and other gaseous substance produced from the premises the equal 1/8th part (or lesser fraction as hereinafter provided); the same to be delivered free of cost to the credit of the Grantee in the pipe lines to which the wells are connected provided that the Grantor may grant to a Lessee or Producer or their assigns the option and exclusive right to purchase the royalty gas, casinghead gas or other product therefrom and to pay to Grantees or deposit for his account in a National Bank the market price at the well provided further that on gas sold at the wells the royalty payment shall be based upon the amount realized from such sale.
 
 
 6
 Emphasis added. The deeds further provided that the conveyance was made "subject to any valid existing oil and gas mining lease ... covering such lands" and in particular was subject to the leases previously granted to Stanolind.
 
 
 7
 In 1957 Alger-Sullivan conveyed the mineral lands to the appellant paper companies and to two other companies whose interests were subsequently acquired by one of the appellants. This conveyance was made expressly subject to the Royalty Dividend Deeds. Accordingly, the appellant paper companies now own all of the mineral lands encumbered by the one-eighth non-participating royalty on oil and gas under those lands. Taslog claims that it now owns the entire oil and gas royalty previously granted to the Alger-Sullivan shareholders.
 
 
 8
 Following the paper companies' purchase of the mineral lands, large gas reserves were discovered on the property and production was begun. The gas produced from the field is not sold at the wellhead but instead is piped from the wells to a treating facility located within the boundaries of the mineral lands. There the raw gas stream, which contains both hydrocarbon and non-hydrocarbon gases commingled in a single stream, is separated into its constituent elements. The hydrogen sulfide gas, the focus of this dispute, is separated from the raw gas stream by absorption through a "Sulfinol" process. The hydrogen sulfide gas is then processed through the facility's sulphur unit where elemental sulphur is extracted from the gas through a severe and radical reaction in the presence of a catalyst. The parties agree that no elemental sulphur is contained in any of the gas produced from appellants' wells and that all the sulphur relative to this appeal is extracted from the hydrogen sulfide gas by way of the above-described chemical processes.
 
 
 9
 After the removal of the hydrogen sulfide gas, the hydrocarbon portion of the gas stream is further processed by separating the hydrocarbons into a natural gas stream called "residue gas" and into several liquid components. The residue gas, liquid components, and sulphur are sold and delivered directly from the treating facility. Taslog has been paid a royalty on the hydrocarbons separated at the treatment facility but has received no royalty on the hydrogen sulfide gas.
 
 
 10
 After the paper companies began producing gas from the mineral lands, a controversy developed between the parties over whether Taslog's one-eighth royalty on "gas including casinghead gas and other gaseous substance produced from the premises" entitled it to a royalty on the hydrogen sulfide gas. Taslog argues, and the district court held, that the Royalty Dividend Deeds conveyed an "in-kind" grant of the total gas stream at the well, thus entitling it to a one-eighth interest in all the constituent elements of the gas stream produced, and not merely the hydrocarbon elements. Appellants argue that they Royalty Dividend Deeds, when considered in the light of the Stanolind leases, are ambiguous on the question of whether Alger-Sullivan intended to convey a royalty on hydrogen sulfide gas in the dividend deeds. Because this alleged ambiguity creates a genuine issue of material fact as to Alger-Sullivan's intent, appellants argue that summary judgment was an inappropriate vehicle for disposing of this case. Appellants also challenge the method adopted by the district court for valuing the disputed hydrogen sulfide gas royalty, arguing that an issue of fact exists as to which valuation method is most appropriate in this case. Finally, appellants argue that summary judgment was improper because, under Alabama property law, Alger-Sullivan could not have conveyed the disputed royalty to Taslog's predecessor in title.
 
 
 11
 A. Ambiguity.
 
 
 12
 The Royalty Dividend Deeds granted a one-eighth royalty on "gas including casinghead gas and other gaseous substance produced from the premises." The district court concluded as a matter of law that, absent an express reservation, a grant of "gas" encompasses all component gases of the total gas stream produced, including hydrogen sulfide gas. The court reasoned that the terms "casinghead gas and other gaseous substance" reinforced its interpretation of the meaning of "gas."
 
 
 13
 The applicable case law supports the district court's construction of the language of the Royalty Dividend Deeds. In Navajo Tribe of Indians v. United States, 364 F.2d 320 (Ct.Cl.1966), the court had to decide whether a lease by the Navajo tribe of "all the oil and gas deposits" under their lands covered helium deposits produced by the lessee. The tribe contended that the term "gas deposits" referred solely to gaseous hydrocarbons and not to helium, a non-hydrocarbon component of the total gas stream. Consequently, the tribe claimed that it was entitled to all the helium produced from the land rather than to a mere royalty interest in the helium. The court disagreed, concluding that "(a)lthough the parties to the lease may have been thinking mainly of fuel-type gases, it is still more realistic to presume that the grant included not only hydrocarbon but other gaseous elements as well." Id. at 326. Finding no express reservation of helium, the court declined to create one.
 
 
 14
 Northern Natural Gas Company v. Grounds, 441 F.2d 704 (10th Cir. 1971), also involved a dispute over helium gas. There, a group of landowners claimed that leases they granted on "oil and gas"[1] did not cover helium but were limited to combustible oil and gas produced from their lands. The court rejected the landowners' attempt "to write into the leases an exception or reservation which is not found in the executed instruments." Id. at 714-15. The court held that absent a specific reservation in the granting instrument, a grant of "gas" in a lease covers all components of the gas stream, including helium.[2]
 
 
 15
 In the present case it is clear that neither the Royalty Dividend Deeds nor the Stanolind leases contain any reservations, specific or otherwise, of any component of the total gas stream produced. In particular, neither of these instruments contains any reservation of hydrogen sulfide gas. To the contrary, both instruments convey a royalty on gas "including casinghead gas and other gaseous substance," thus suggesting a specific intent to convey all components of the gas stream.
 
 
 16
 The paper companies do not question the interpretation of the term "gas" reached in Navajo Tribe and Northern Natural. Instead, they contend that the grantor of the Royalty Dividend Deeds, unlike the lessors in Navajo Tribe and Northern Natural, did specifically reserve a portion of the gas stream hydrogen sulfide gas when it made the dividend deeds expressly subject to the Stanolind leases. Appellants point out that in the Stanolind leases Alger-Sullivan retained not only a royalty on the oil and gas but also "$.50 for each long ton of sulphur produced and marketed from the land." Appellants argue that the sulphur it extracts from the hydrogen sulfide gas is "produced and marketed from the land" within the meaning of the Stanolind lease sulphur royalty clause. Because Alger-Sullivan did not include a sulphur royalty clause in the Royalty Dividend Deeds, and because Alger-Sullivan specifically retained all royalties under the Stanolind leases not included in the Royalty Dividend Deeds, appellants argue that Alger-Sullivan never intended to convey to Taslog's predecessors any royalty on hydrogen sulfide gas.[3]
 
 
 17
 Thus, the central premise of appellants' argument is that under the language of the Stanolind leases, any royalty due on hydrogen sulfide gas would have been paid under the leases' sulphur royalty clause rather than under the clause granting a royalty "on gas ... and other gaseous substance." Only if we accept this argument can we find that the gas royalty now owned by Taslog does not grant it an interest in the hydrogen sulfide gas. We conclude that the district court properly rejected appellants' argument as an unreasonable interpretation of the provisions of the Stanolind leases.
 
 
 18
 Appellants cite Calvert v. Phillips Chemical Company, 268 S.W.2d 478 (Tex.Civ.App. 1954, writ ref'd), as authority for their position that sulphur extracted from hydrogen sulfide gas is "sulphur produced ... from the land" within the meaning of the Stanolind leases' sulphur royalty provision. In Calvert the question was whether a Texas statute imposing a tax on "sulphur producers" applied to Phillips Chemical Company. Phillips purchased hydrogen sulfide gas from Texas landowners and then used a chemical process to extract sulphur from the gas. The court held that Phillips "produced" sulphur even though it did not engage in mining operations, the more traditional method of recovering sulphur.
 
 
 19
 Appellants have struck a dry well in Calvert. There the question was whether Phillips produced sulphur "within this State" when it extracted sulphur from hydrogen sulfide gas. The court was not concerned with the question of whether the sulphur so extracted was "produced ... from the land" from which the hydrogen sulfide gas was removed. Indeed, if anything, the case favors Taslog's position rather than appellants'. In Calvert the producer of the sulphur was not the owner of the land where the hydrogen sulfide gas was removed but the owner of the treatment plant that extracted the sulphur from the gas. Although the case did not pose the question of whether the landowners produced "sulphur within the State" when they took hydrogen sulfide gas from the wellhead, the holding that Phillips produced sulphur at its treatment facility would seem to exclude the landowners as sulphur producers. Calvert therefore is consistent with Taslog's view that sulphur extracted from hydrogen sulfide gas is produced from the gas and not from the land where the gas was removed.
 
 
 20
 Appellants have cited no other case law authority for their position that sulphur extracted from hydrogen sulfide gas is "sulphur produced ... from the land." Furthermore, appellants admitted that they were unable to discover any instance where sulphur royalties have been paid on hydrogen sulfide gas, and they have not challenged Taslog's assertion that the common industry practice is to pay gas royalties and not sulphur royalties on hydrogen sulfide gas. The appellants point out, however, that the typical industry sulphur royalty clause refers to sulphur "mined and marketed" rather than to sulphur "produced and marketed," the language employed in the Stanolind leases. Appellants argue that the substitution of the more expansive word "produced" establishes that Alger-Sullivan intended for the sulphur royalty clause to cover hydrogen sulfide-type sulphur. Appellants contend that, in any event, conflicting reasonable inferences are possible regarding Alger-Sullivan's intentions and, therefore, that summary judgment was improper.
 
 
 21
 A district court may grant summary judgment when it appears that there is no genuine issue as to any material fact and that the moving party is entitled to the judgment as a matter of law. Fed.R.Civ.P. 56(c). Where a contract or other material document in a case is ambiguous,[4] an issue of fact arises as to the parties' intent, and summary judgment is improper. Oil Trading Association v. Texas City Refining, Inc., 201 F.Supp. 846, 849 (S.D.N.Y.1962). However, the preliminary question of whether an ambiguity does or does not exist is a question of law for the court to decide. Freeman v. Continental Gin Company, 381 F.2d 459, 465 (5th Cir. 1967). The district court determined that the documents in this case were not ambiguous and that summary judgment was appropriate. We agree.
 
 
 22
 Both the Stanolind leases and the Royalty Dividend Deeds provide a royalty on "gas including casinghead gas and other gaseous substance" produced from the mineral lands. There can be no question that this language is broad enough to cover any gas, whether of a hydrocarbon or nonhydrocarbon nature, contained in the raw gas stream flowing through appellants' wellheads. Furthermore, in this case it is uncontested that only liquid hydrocarbons and various gaseous substances including hydrogen sulfide gas are produced from the wells on the mineral lands. No elemental sulphur is found in any component of the gas stream produced. Only after extensive separation and manufacturing efforts are appellants able to extract elemental sulphur from the hydrogen sulfide gas portion of the raw gas stream.
 
 
 23
 We conclude that, under these facts, no elemental sulphur is "produced from the land." Instead, the sulphur is produced from the gas that is produced from the land. We therefore affirm the district court's conclusion that there is no genuine issue of material fact as to which royalty clause the gas or the sulphur clause applies to hydrogen sulfide gas. The gas clause clearly prevails on these facts. If the parties to the Stanolind leases or the Royalty Dividend Deeds had intended to reserve any portion of the raw gas stream from the grant of "gas ... or other gaseous substance," they could have employed language that indicated their intent. Instead, the parties used unambiguous language that indicated an intent to convey a gas royalty on the entire gas stream produced from the mineral lands, and Taslog is clearly entitled to a one-eighth royalty on each "gaseous substance" produced.
 
 
 24
 Our conclusion is bolstered by the language of the gas royalty clause that any royalty payment was to be based on the "market price at the well" of the gas produced. As we discuss in the following section, the hydrogen sulfide gas produced from the mineral lands has a market value, though it may not have a readily available market, at the wellhead. Taslog's interest in "gas" clearly entitles it to a royalty on any gaseous substance that has a market value at the wellhead. Thus, if the paper companies, rather than processing it themselves, sold the hydrogen sulfide gas to some third party, Taslog would clearly be entitled to a gas royalty interest in the proceeds of this sale. What the third party did with the gas it purchased would be immaterial to either Taslog or appellants. In our view, what the paper companies do with the hydrogen sulfide gas[5] should not determine whether Taslog is entitled to a royalty on the gas produced. Such a result would require an unreasonable construction of the language used by the parties in the Stanolind leases and the Royalty Dividend Deeds. Finding no ambiguity, we uphold the lower court's use of summary judgment to dispose of this case.
 
 
 25
 B. Valuation.
 
 
 26
 The Royalty Dividend Deeds provided that the one-eighth gas royalty was to be based upon "the market price at the well provided that on gas sold at the wells the royalty payment shall be based on the amount realized from such sale." None of the gas produced from the mineral lands is sold at the wellhead. Therefore, the task in this case is to determine "the market price at the well" of the hydrogen sulfide gas produced from appellants' property.
 
 
 27
 The district court in its findings of fact determined that the parties did not dispute "the manner in which the market price at the well is calculated where the gas is not actually sold at the wellhead." The court found that the hydrogen sulfide gas contained in the wellhead gas stream had no ascertainable market value until after it was processed. After processing, the market value of the gas could be determined by measuring the "net sales revenue for all elements sold from the gas stream after deducting the cost of transmission and processing."
 
 
 28
 We agree that the method of valuing Taslog's royalty on hydrogen sulfide gas is not in issue, at least with respect to one of the three gas fields located on the mineral lands.[6] Following the discovery of gas on the mineral lands Taslog and the paper companies entered into contracts "division orders" for the Big Escambia Creek Field. In these division orders the parties outlined the method by which Taslog would receive its royalty payments:
 
 
 29
 Taslog authorizes Mineral Owner to take and retain possession of all Raw Gas produced from each Unit Well which is attributable to Taslog's royalty interest as reflected on the attached Schedule for such well, such Raw Gas to become the property of the Mineral Owner as soon as such Raw Gas is delivered to the Plant. Subject to the provisions of Paragraph 8 hereof, Mineral Owner further agrees that Taslog shall be entitled to receive its proportionate share of the proceeds which have been received by Mineral Owner from the sale of Sulphur, Liquid Hydrocarbons and gas extracted from the Raw Gas, after first deducting the cost of treating and processing as hereinafter specified in paragraph 4 hereof and the severance and production taxes applicable thereto.
 
 
 30
 Emphasis added. Under this agreement, the market value of hydrogen sulfide gas would be determined from the sales revenue generated by the sale of the sulphur extracted from the gas. Thus, the district court merely recognized the valuation method previously adopted by the parties.
 
 
 31
 Appellants reject the finding that there is no dispute concerning the method of valuing the hydrogen sulfide gas. Appellants point out that the passage from the division orders quoted by Taslog was made "(s)ubject to the provisions of Paragraph 8 hereof." In Paragraph 8 the parties set forth their respective positions over whether Taslog's gas royalty encompassed the entire gas stream, including hydrogen sulfide gas, or was limited to merely the hydrocarbon elements of the stream. The parties then stated that
 
 
 32
 It is specifically understood and agreed that nothing herein contained shall be construed as a recognition by Mineral Owner that Taslog's claim to a share of the proceeds from the sale of sulphur is a valid claim, and both parties agree that the question may be litigated in the future with neither party being prejudiced by this agreement or by any payment hereunder by Mineral Owner to Taslog of proceeds from the sale of sulphur.
 
 
 33
 Appellants argue that, in view of this provision, they are not bound by the valuation method outlined in the division orders.
 
 
 34
 Appellants have misconstrued the language of Paragraph 8. The function of this provision was to set forth the controversy surrounding Taslog's claim to a royalty on hydrogen sulfide gas and to preserve the parties' right to litigate this question without being prejudiced by the terms of the division orders. Nothing in the agreement indicates any dispute over the method of valuing the royalty, if one was found to exist. Appellants' argument that Paragraph 8 relieves them of any agreement as to valuation is without merit. Accordingly, the district court did not err in ruling that valuation was not an issue in this case.
 
 
 35
 Appellants next contend that under this court's opinion in Phillips Petroleum Company v. Johnson, 155 F.2d 185 (5th Cir.), cert. denied, 329 U.S. 730, 67 S.Ct. 87, 91 L.Ed. 632 (1946), the valuation method agreed to in the division orders and adopted by the district court is an incorrect method of measuring the "market price at the well" of the hydrogen sulfide gas. We disagree.
 
 
 36
 In Johnson the Phillips Petroleum Company, as lessee, produced natural gas from wells on the lessor's lands. Phillips did not sell the gas at the well but transported it to a Phillips' plant where the liquefiable gasoline was removed, and the residue gas was sold to producers of carbon black. The gasoline was further processed to make many blended hydrocarbon products which were then sold by Phillips. The court had to apply these facts to a royalty clause that provided
 
 
 37
 If any well on said premises shall produce natural gas in paying quantities, and such natural gas is used off the premises or marketed by the lessee, then lessor shall be paid at the rate of one-eighth of the net proceeds derived from sale of gas at the mouth of the well.
 
 
 38
 Emphasis added by the court.
 
 
 39
 The court determined that different methods of valuation should be applied to the residue gas and the gasoline. The court held that because the residue gas was sold or "marketed" by Phillips, the lessor was entitled to one-eighth of the proceeds of the sale less the costs of transporting, separating, and marketing. However, because the gasoline was not sold but was used by Phillips, there were no proceeds at the mouth of the well and therefore the net-proceeds method of valuation could not be applied. Instead, the lessor was entitled to the fair value of the gasoline at the point before it was used to manufacture the blended hydrocarbon products.
 
 
 40
 Appellants argue that Johnson supports their position that Taslog is entitled only to the value of the hydrogen sulfide gas stream and not to a percentage of the sulphur extracted from the gas. Appellants have misread Johnson. There the royalty on "natural gas ... used ... or marketed by the lessee" was applied to the liquefiable gasoline recovered from the gas. This gasoline was easily transportable and had an ascertainable market value. Hydrogen sulfide gas, on the other hand, when separated from other gases becomes an "acid gas stream" which is not readily transportable to a market unless there is a commercial user of the product in the vicinity. The absence of an available market does not mean that the gas lacks value, however. In such situations the fair value of the gas is extrapolated by deducting from the sales revenue of the sulphur extracted from the gas the cost of transmission, processing, and a reasonable return on investment. Taslog introduced evidence, undisputed by appellants, that this method of valuation is universally used in the oil and gas industry to determine the value of hydrogen sulfide gas "at all well." The district court did not err in adopting a method of valuation that was agreed to by the parties and that is consistent with both applicable legal principles and industry practice.
 
 
 41
 C. Title.
 
 
 42
 Finally appellants contend that Alger-Sullivan lacked title to convey to Taslog's predecessors any royalty interest in hydrogen sulfide-type sulphur. Appellants point out that at the time Alger-Sullivan executed the Royalty Dividend Deeds the Stanolind leases were still in effect. Because these leases reserved Alger-Sullivan only "$.50 for each long ton of sulphur produced from the land," appellants reason that Alger-Sullivan could have conveyed no greater interest than it owned. Alger-Sullivan's remaining interest in the sulphur was a mere possibility of reverter, a future interest which appellants contend is inalienable under Alabama law.
 
 
 43
 There is no merit to this argument. When Alger-Sullivan executed the Stanolind leases it retained, in addition to the $.50 sulphur royalty, a royalty on "gas including casinghead gas or other gaseous substance" produced from the land. Alger-Sullivan later conveyed this same gas royalty interest to its shareholders, who then conveyed it to Taslog. As we have already determined, it was this gas royalty clause, rather than the sulphur royalty clause cited by appellants, that covers sulphur extracted from hydrogen sulfide gas. When Alger-Sullivan executed the Royalty Dividend Deeds it had title to convey, and did convey, its one-eighth gas royalty. The question of Alger-Sullivan's power to convey an interest in elemental sulphur is irrelevant to the disposition of this case.
 
 
 44
 We AFFIRM.
 
 
 
 [1]
 Although the case involved "thousands of leases and a great variety of lease forms," most of the leases granted a royalty on "oil and gas, casinghead gas and casinghead gasoline." Northern Natural Gas Co., supra, 441 F.2d at 709, 710. Five of the leases, however, specifically covered "all gaseous substances." Id. at 710. It is interesting to note that the landowners in Northern Natural conceded that the term "all gaseous substances" included helium
 
 
 [2]
 The Northern Natural court, expressly disagreeing with the Navajo Tribe court, held that the question whether the word "gas" included helium was one of fact rather than one of law. The court's review of the facts, however, was limited solely to a review of the granting instrument. Because the instrument contained no specific reservation of some component of the gas stream, the court held in effect as a matter of law that the grant of "gas" included all components of the gas stream
 In the present case the evidentiary facts are not in dispute and, as we explain below, there is only one reasonable conclusion to be drawn from those facts. In this situation the district court did not err in holding that Taslog was entitled to prevail as a matter of law.
 
 
 [3]
 In a separate argument appellants quote language from the granting clause of the Royalty Dividend Deeds referring to a royalty on "the oil, gas and related petroleum products" under the mineral lands. Appellants argue that the phrase "related petroleum products" restricts the grant of oil and gas to hydrocarbons only and excludes hydrogen sulfide gas. In addition, they argue that the restrictive nature of the granting clause conflicts with the language of the gas royalty clause granting an interest in "gas including casinghead gas and other gaseous substance." This alleged conflict, argue appellants, gives rise to a question of fact as to whether the dividend deeds were intended to convey a royalty on hydrogen sulfide gas
 We find that appellants, by quoting only a portion of the language of the granting clause, have created a conflict where there is none. In the first paragraph of the Royalty Dividend Deeds, Alger-Sullivan granted to its shareholders their proportionate share "of the individual royalty interest hereinafter described in all the oil, gas and related petroleum products in and under and that may be produced from all lands and oil or gas interests, complete or fractional, now owned by the Grantor in (the mineral lands)...." Emphasis added. Among the oil and gas interests then owned by Alger-Sullivan were the royalties retained in the Stanolind leases. As we discuss below, the Stanolind royalty on "gas" was not limited to the hydrocarbon components of the gas stream but included the non-hydrocarbon components as well. Thus, in granting its shareholders a royalty in "the oil or gas interest ... now owned by the Grantor," a phrase on equal footing with the phrase quoted by appellants, Alger-Sullivan conveyed an interest on both the hydrocarbon and non-hydrocarbon elements of the gas stream produced from the mineral lands.
 
 
 [4]
 Prior to the entry of summary judgment in this action, both sides introduced extrinsic evidence bearing on the question of Alger-Sullivan's intentions when it executed the Royalty Dividend Deeds. Appellants contend that the fact that the parties perceived the need to introduce extrinsic evidence demonstrates that the Royalty Dividend Deeds are inherently ambiguous
 Appellants have overlooked an important aspect of federal summary judgment procedure. Under Fed.R.Civ.P. 56(d), if a court finds that summary judgment is inappropriate because there are genuine issues to be tried, it "shall if practicable ascertain what material facts exist without controversy" and enter an order specifying those facts. The facts determined under Rule 56(d) will be "deemed established" at trial. In view of this rule it is clear that introducing extrinsic evidence did not prove ambiguity in the dividend deeds. Rather, it merely demonstrated that the parties were aware that if summary judgment were not granted, certain facts could be deemed established and would be binding on them at trial. Furthermore, the introduction of extrinsic evidence by the parties did not preclude the court from finding that no ambiguity existed.
 
 
 [5]
 It is at least possible that another commercial use for hydrogen sulfide gas will be developed. If appellants, instead of extracting sulphur from the gas, used it to make liquid hydrogen or Swiss cheese, it is clear that Taslog would be entitled to a gas royalty on the market value of the gas at the wellhead. Again, what the gas is used for should not determine whether Taslog is entitled to its "gas" royalty
 
 
 [6]
 The production of gas from the mineral lands is located in three Alabama fields: Big Escambia Creek, Flomaton, and Fanny Church. The production process at Big Escambia Creek Field is typical of the three fields
 Taslog and each of the appellants executed division orders for the Big Escambia Field. At the time the judgment was entered, however, the parties had not completed negotiations regarding the division orders for the remaining fields.