784 F.2d 659
 FIRST NATIONAL BANK OF JACKSON, as Trustee of the Dr. J.E.
Wadlington Family Trust, Plaintiff-Appellee,
v.
PURSUE ENERGY CORPORATION, 3300 Corporation, and Grace
Petroleum Corporation, Defendants-Appellants.
 No. 85-4291.
 United States Court of Appeals,
Fifth Circuit.
 March 12, 1986.
 
 Alex A. Alston, Jr., Janice Holly Parsons, Jackson, Miss., for Pursue Energy Corp. and Grace Petroleum Corp.
 Thomas L. Kirkland, Jr., Jackson, Miss., for 3300 Corp.
 W. McDonald Nichols, Wise & Carter, J. Leray McNamara, Jackson, Miss., for First Nat. Bank of Jackson.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before THORNBERRY, RUBIN and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 This appeal requires us to determine whether the district court properly granted summary judgment for the appellee, holding that the lessor's interpretation of an oil, gas and mineral lease, that sulphur royalties were to be paid under the gas royalty paragraph, was correct. Because we find that the lease is ambiguous as to which clause applies to the payment of royalties on sulphur, and because we find that prior case law by this court does not control this case, we vacate the summary judgment and remand for trial.
 
 
 2
 * A.
 
 
 3
 On March 18, 1973, Dr. J.E. Wadlington executed an oil, gas and mineral lease covering 310 acres of land in Rankin County, Mississippi. On October 9, 1980, Dr. Wadlington transferred all of his interest in this property, including his royalty interests in any oil, gas and other minerals produced from this property, to First National Bank of Jackson, as trustee of the Dr. J.E. Wadlington Family Trust (the Trust). Through later conveyances and assignments, Pursue Energy Corporation (Pursue), 3300 Corporation (3300), and Grace Petroleum Corporation (Grace) (collectively Pursue) became the lessees under the lease. Fifty percent of the lease is owned by Pursue, twenty-five percent by 3300, and twenty-five percent by Grace.
 
 
 4
 In 1978, Pursue, as operator, was granted a permit by the Mississippi Oil and Gas Board to drill a gas well designated as the D'Lo Royalties Unit No. 1 (Unit 1), which included the property covered by the Wadlington lease. A well was completed in August 1978, and the first production began in October 1978. Grace and 3300 are working-interest owners in Unit 1, and Pursue acts as operator.
 
 
 5
 The gas produced from Unit 1 is known in the industry as "sour gas." Sour gas possesses a high content of hydrogen sulphide, a highly toxic nonhydrocarbon gas. Because of the presence of hydrogen sulphide, sour gas is unusuable until processed. At the wellhead, measurements are taken of the volumes produced and of the hydrocarbon and hydrogen sulphide content of the gas. Afterwards, the sour gas is delivered in pipelines to a processing plant operated by Pursue Gas Processing and Petrochemical Company. The processing plant removes the hydrogen sulphide and carbon dioxide components from the gas. The residue gas is then delivered into a pipeline owned by the purchaser, Southern Natural Gas Company, who buys the gas at an agreed upon price. The hydrogen sulphide and other components removed from the sour gas are processed through the sulphur recovery portion of the plant, yielding marketable sulphur, which is delivered to the purchasers' railtank cars at the plant site and sold at an agreed price per long ton.
 
 
 6
 On or about September 25, 1981, Pursue, in its own right and as agent for 3300 and Grace, delivered to the Trustee a "Sulphur Division Order," which read in pertinent part:
 
 
 7
 2. The Acreage Factor represents the number of net acres in said unit on which the undersigned owns a royalty on sulphur, divided by the total number of acres in said unit. You shall calculate payments hereunder by multiplying the Acreage Factor by the monthly sulphur volumes produced from said unit and by the fixed royalty price for the sulphur mined and marketed which is stated in the Oil, Gas and Mineral Lease through which payments are being made to the undersigned. (Emphasis added.)
 
 
 8
 The Trust refused to sign the Sulphur Division Order, contending that the royalty to be paid for sulphur manufactured from the gas is controlled by the one-eighth gas royalty provision of subparagraph 3(b) of the lease instead of the fixed royalty for "sulphur mined and marketed" of $1 per long ton provided in subparagraph 3(c). Pursue continues to maintain that the fixed royalty provision controls.
 
 B.
 
 9
 In March 1983, the Trust filed suit against Pursue, 3300 and Grace, seeking payment of the royalty on sulphur under the one-eighth royalty provision instead of the fixed royalty provision of $1 per long ton. On June 15, 1984, the Trust filed a motion for partial summary judgment. In addition to contending that the one-eighth gas royalty clause provided the proper basis for payment, the Trust sought prejudgment interest at the rate of eight percent, punitive damages, and attorney's fees. On July 30, 1984, Pursue filed a cross-motion for summary judgment.
 
 
 10
 On October 4, 1984, the district court granted the Trust's motion for partial summary judgment and denied Pursue's cross-motion. In its opinion, the court cited Scott Paper Co. v. Taslog, Inc., 638 F.2d 790 (5th Cir.1981), to support the proposition that the Trust was entitled to payment of royalty on sulphur manufactured from the sour gas under the one-eighth gas royalty provision. The court also granted the Trust's claim for prejudgment interest on any amounts found to be due as royalty after July 1, 1983, the effective date of Miss.Code Ann. Sec. 53-3-39 (Supp.1984).
 
 
 11
 The Trust's claims for punitive damages and attorney's fees against 3300 were settled and an order dismissing these claims was entered on January 18, 1985. On March 26, 1985, the case against Pursue and Grace on the issues of punitive damages and attorney's fees proceeded to a bench trial. The court found for Pursue and Grace, and the Trust has not appealed. Final judgment was entered by the court on April 8, 1985. Pursue filed a timely notice of appeal.
 
 II
 
 12
 The sole issue on appeal is whether the lease unambiguously states which paragraph applies to the payment of royalties on sulphur extracted from sour gas: the gas clause or the sulphur clause. The subject lease reads, in pertinent part:
 
 
 13
 3. As royalty, lessee convenants and agrees:
 
 
 14
 * * *
 
 
 15
 * * *
 
 
 16
 (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas.
 
 
 17
 (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be One Dollar ($1.00) per long ton.
 
 
 18
 The Trust asserts that subdivision (b), providing for the payment of royalties for gas, applies to the payment for sulphur produced from sour gas; Pursue contends that subdivision (c), providing for the payment of royalties for minerals, specifically mentioning sulphur, applies. Both the Trust and the district court rely on our holding in Scott Paper to support their respective positions. Because we find that paragraph 3 of the lease does not clearly state whether the sulphur should be paid for under subdivision (b) or (c), we find that the contract is ambiguous on its face. Moreover, we find that the district court erred in holding that this case was controlled by Scott Paper, as we find several material distinctions between this case and Scott Paper.
 
 III
 
 19
 "The generally accepted rule is that the interpretation of a contract is a question of law, not fact, and appellate review is not limited to the 'clearly erroneous' rule.... An exception to this rule is the situation in which extrinsic evidence has been used in interpreting an ambiguous contract." Paragon Resources v. National Fuel Gas Distribution Corp., 695 F.2d 991, 995 (5th Cir.1983) (quoting Thornton v. Bean Contract Co., 592 F.2d 1287, 1290 (5th Cir.1980)). "The district court's determination of non-ambiguity is a conclusion of law that we review de novo." Southern Natural Gas Co. v. Pursue Energy Corp., 781 F.2d 1079, 1081 (5th Cir.1986); Freeman v. Continental Gin Co., 381 F.2d 459, 465 (5th Cir.1967).
 
 
 20
 This court is required to determine the obligations of the parties to a contract by a careful examination of the four corners of the document. J. Russell Flowers, Inc. v. Itel Corp., 495 F.Supp. 88, 91 (N.D.Miss.1980); Robinson v. Martel Enterprises, Inc., 337 So.2d 698, 701 (Miss.1976). The intent of the parties must be gleaned from the language used in the contract. Valley Cement Industries, Inc. v. Midco Equipment Co., 570 F.2d 1241, 1242 (5th Cir.1978) (construing Mississippi law); Welborn v. Henry, 252 So.2d 779, 780 (Miss.1971). We must construe every word and clause in a contract to have some meaning, if it can reasonably be done. Glantz Contracting Co. v. General Electric Co., 379 So.2d 912, 917 (Miss.1980). This court may consider extraneous evidence only if a contract is ambiguous on its face. Finally, courts must resolve conflicts by giving full effect to more particular clauses over more general clauses. See Dunn v. Stratton, 160 Miss. 1, 133 So. 140, 142 (1931); 4 Williston on Contracts Sec. 624, at 822 (3d ed. 1961).
 
 
 21
 Reviewing only the plain language of the lease, we find that we are unable to determine whether the sulphur extracted from the sour gas should be paid for under the gas or mineral clause. We find that there are several arguments in favor of either interpretation. For example, the subject lease could be construed as requiring the producers to pay for the exact item they remove from the ground; that is, Pursue mines gas, receives gas, and so should be required to pay for gas. Under this construction, the sulphur should be paid for under subsection 3(b).
 
 
 22
 Alternatively, the rule of contract interpretation which requires that more particular clauses be given effect over more general clauses must be considered when interpreting this contract. Under this legal doctrine, it might be effectively argued that the parties intended that Pursue pay royalties under subsection 3(c), which specifically mentions sulphur, instead of 3(b), which does not. Indeed, Pursue argues that:
 
 
 23
 combined sulphur in the form of hydrogen sulphide should be more closely identified with the royalty provision for sulphur "mined and marketed," than the very broad and indefinite term "gas or gaseous substance." Although the combined sulphur may initially be in a gaseous form, the specific royalty provision referring to the marketing of sulphur is obviously more descriptive and definite than the general term gas or gaseous substance.
 
 
 24
 Even though this construction is reasonable, it avoids the initial unresolved factual questions. No elemental sulphur is found in any of the gas stream produced. Pursue is able to extract elemental sulphur only after extensive separation and processing efforts. Thus, the rule of contract interpretation is inconclusive unless we can first determine the primary question: that is, whether minerals separated from other substances should be paid for in the form that they eventually end up or the form in which they are removed from the ground. Since the contract does not resolve the question on its face, we find that the contract is ambiguous. Since the contract is ambiguous, the district court should have examined extrinsic evidence. Thus, we find that summary judgment should not have been granted on the grounds that the lease was ambiguous.[1]
 
 IV
 
 25
 The district court in the instant case found that Scott Paper controlled this case. We disagree. Although the question facing this court in both Scott Paper and the instant case is the same, the underlying contracts themselves, are materially different for several reasons. First, the language of the Scott Paper lease and the lease in the instant case is different. The lease in Scott Paper provided a royalty "on gas including casinghead gas and other gaseous substance produced from the premises." The question in the case was whether the "royalty burdened the entire gas stream from [the] wells, including hydrogen sulfide gas, or whether it was limited to merely the hydrocarbon elements of the gas stream." Scott Paper, 638 F.2d at 792.
 
 
 26
 The district court in Scott Paper "concluded as a matter of law that, absent an express reservation, a grant of 'gas' encompasses all component gases of the total gas stream produced, including hydrogen sulfide gas. The court reasoned that the terms 'casinghead gas and other gaseous substance' reinforced its interpretation of the meaning of 'gas.' " Id. at 793. After reviewing prior case law, we affirmed the district court's holding that "gas and other gaseous substances" suggests a specific intent to convey all components of the gas stream.
 
 
 27
 In contrast, the contract in the instant case provides a royalty on gas, but does not mention "gaseous substances." Thus, this language, relied on by both the district court and this court in Scott Paper, is absent in the instant case. Although we held that the more inclusive term "gas and other gaseous substances" suggests a specific intent to convey all components of the gas stream, we hold today only that the use of the word "gas" does not convey this wide an interest. If we were to hold otherwise, we would eliminate the meaning of the words "and other gaseous substances." Because every word and clause in a contract must be construed to have some meaning, we must reject the Trust's interpretation which negates the meaning of "and other gaseous substances."
 
 
 28
 Moreover, the deed in Scott Paper made no express reference to the payment for sulphur, unlike the subject lease in the instant case. While the court in Scott Paper interpreted the deed in light of expired mineral leases which did provide for a sulphur royalty payment, we cannot say that the court's result was not based in part on the deed's failure to expressly provide for sulphur royalties.
 
 
 29
 Second, the type of contracts involved in the two cases are different. In Scott Paper, the royalty provision before the court was a market value lease whereas the royalty provision in the instant case is a proceeds lease. The differences between these two types of leases is that in a market value lease, the royalty obligation attaches when the substance is produced and the current market value is determined by reference to the substance produced. Conversely, in a proceeds lease, the royalty attaches when the substance is sold. This distinction may determine whether Pursue should pay the Trust for the substance that is removed from the ground, sour gas, or the substance that is eventually sold, sulphur. Without determining which result is correct, we note that this distinction between the contracts in Scott Paper and the instant case mitigates against Scott Paper controlling this case.
 
 
 30
 Third, the law applicable in this case is different than that which was applicable in Scott Paper. In the instant case, this court is required to apply Mississippi law, while Alabama law applied in Scott Paper. Mississippi law in 1973, the year the leases in question were executed, defined gas as excluding nonhydrocarbons; thus, hydrogen sulphide, a nonhydrocarbon, was not legally gas for some purposes. This court was not confronted by a similar statute in Scott Paper. The district court must determine whether this distinction influences whether the Scott Paper result should apply in the instant case.
 
 
 31
 Finally, there are material issues of fact in dispute in this case that were agreed between the parties in Scott Paper. In Scott Paper, the producer stipulated that current industry practice supported payment for the sulphur under the gas clause. See also Piney Woods Country Life School v. Shell Oil Co., 726 F.2d 225 (5th Cir.1984). In contrast, Pursue vigorously contends that the industry does not follow a consistent practice of paying for the sulphur under either the gas or mineral clauses. The practice of the industry regarding the proper payment of royalties appears to be a material issue of fact which is presently in dispute. This dispute both differentiates this case from Scott Paper[2] and renders summary judgment inappropriate.
 
 V
 
 32
 Because we find that the Trust's motion for summary judgment should not have been granted, we need not reach the question of whether the district court properly granted prejudgment interest to the Trust.
 
 VI
 
 33
 We are unable to state, as a matter of law, that this contract must be construed in favor of either the Trust or Pursue. We believe that extrinsic evidence on the practice of the industry, the parties' intent, and other factual matters are necessary for a correct interpretation of the subject lease. Since this lease is ambiguous and prior case law of this court does not control this contract's interpretation, the judgment of the district court is vacated and the case is remanded for further proceedings.
 
 
 34
 VACATED AND REMANDED.
 
 
 
 [1]
 We do not exhaust the plausible arguments made for the respective interpretations of the lease, all of which only underscore the ambiguity of the document. We simply leave it to the district court to examine and weigh each of the parties' arguments
 
 
 [2]
 While we find that Scott Paper does not control this case, we note that Scott Paper is obviously a relevant case that the district court may find important to consider when further facts are developed