Robert R. SCHWARTZ, et al.,
Appellants,

v.

PRAIRIE PRODUCING CO.,
INC., Appellee.

No. 01–86–0256–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 29, 1987.

Rehearing Denied Feb. 19, 1987.

Robert R. Schwartz, Tyler, for appellants.

Frank Douglass, Scott, Douglass & Luton Austin, Charles G. King, Dick Calkins, Houston, for appellee.

Before SAM BASS, COHEN and DUNN, JJ.

## OPINION

COHEN, Justice.

This is an appeal from a summary judgment construing oil, gas, and mineral leases.

Appellants own mineral interests in two tracts of land on which they executed eight leases that were assigned to appellee. Appellee pooled the tracts into two separate gas units that include three producing gas wells. Each well produces sour gas, which is gas that contains hydrogen sulfide.

Appellee contracted with Cities Service Co. for delivery of sour gas at the wellhead. Cities Service would transport the sour gas to its processing facility, where sulphur was recovered from the hydrogen sulfide gas. Cities Service would keep 15–20% of the sulphur produced and return the remaining sulphur to appellee, which would sell it to third parties.

Appellee tendered to appellants one dollar per long ton of sulphur extracted from the gas, the royalty provided in the lease for sulphur. However, appellants refused the payments and sued, claiming that under the gas clause of the lease, they were entitled to recover a greater amount, namely, one-fourth of appellee's net proceeds from the sales of sulphur recovered from the hydrogen sulfide gas.

Both parties contend that the leases are unambiguous, but they disagree on which royalty provision applies. The sole issue on appeal is which subsection applies, 3(b)(1) or 3(c). Appellants contend that they are entitled to royalties on *hydrogen sulfide gas* under subsection 3(b)(1), the gas clause, because hydrogen sulfide is a gas that was sold to Cities Service. Appellee contends that subsection 3(c), the sulphur clause, applies because it was "sulphur *mined and marketed" that was sold to Cities Service and to third parties.*

The disputed provision of each lease is identical. It refers to appellants as "lessor" and to appellee as "lessee" and provides:

3. As royalty, lessee covenants and agrees: ... (b) To pay lessor on *gas* and casinghead gas produced from said land (1) when sold by lessee, ¼ of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well,

of ¼ of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on *sulphur mined and marketed* the royalty shall be one dollar ($1.00) per long ton. (Emphasis supplied.)

In construing the leases, this Court must seek the intention of the parties, as expressed in each lease. Ordinarily, the lease alone is deemed to express the parties' intent. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968). Their intent is found by considering all of the lease's provisions and by harmonizing, if possible, those that conflict. If such a conflict or ambiguity makes the lease susceptible of two reasonable meanings, extrinsic evidence is admissible to resolve the conflict or ambiguity. *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341 (1957). However, extrinsic evidence cannot be considered if the lease clearly discloses the parties' intention, or if the lease is susceptible of only one legal meaning. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726 (Tex.1981). Moreover, a mineral lease is to be strictly construed against the lessee and in favor of the lessor, the appellants. *Clark v. Perez*, 679 S.W.2d 710 (Tex.App.—San Antonio 1984, no writ); 3 H. Williams, *Oil and Gas Law* sec. 628 (1981).

Appellants maintain that hydrogen sulfide gas is not "sulphur" within the meaning of 3(c), and that only elemental sulphur, i.e., sulphur existing as an uncombined chemical element, is covered by that section. They argue that, under *Exxon v. Middleton*, 613 S.W.2d 240 (Tex.1981), the hydrogen sulfide gas is "sold" by appellee to Cities Service upon delivery "at the mouth of the well," and that the price received is 80–85% of the elemental sulphur later recovered. They contend that this constitutes a sale, even though the consideration paid by Cities Service to appellee is sulphur rather than cash. Thus, they say that they are entitled to ¼ of the value of the sulphur returned to appellee, pursuant to section 3(b)(1). *See* Tex.Bus. & Comm. Code Ann. arts. 2.106(a), 2.304(a) (Vernon 1968).

Appellee responds that hydrogen sulfide gas is a dangerous corrosive poison, a degrading impurity that has no value at the wellhead, except for the potential to extract sulphur from it, and that the lease's references to sulphur show that the parties intended to treat sulphur differently from gas or other minerals by naming it specifically and repeatedly, throughout each lease. They argue that this intent is apparent from reading each lease as a whole, and therefore, that the specific sulphur royalty in subsection 3(c) controls over the general reference to "gas," which would impliedly include hydrogen sulfide gas, within the "gas" royalties of section 3(b)(1).

The question of whether royalties on sulphur extracted from sour gas should be paid under the gas clause or the sulphur clause has aroused controversy recently in the United States Court of Appeals for the Fifth Circuit. *First National Bank v. Pursue Energy Corp.*, 784 F.2d 659 (5th Cir.1986) ("*Pursue I*"), vacated by, 799 F.2d 149 (5th Cir.1986) ("*Pursue II*"). *Pursue* involved the same legal issue and construed a royalty provision identical to that in the instant case.

In *Pursue*, the federal district court had granted a summary judgment for the lessor and held that the lease unambiguously entitled the lessor to royalties under the gas clause for sulphur manufactured from sour gas. In *Pursue I*, the appellate court reversed that judgment and held that the lease was ambiguous. To show the ambiguity, the court set out arguments favoring royalty payments under either of the two clauses. 784 F.2d at 662–63. The court distinguished its prior decision in *Scott Paper Co. v. Taslog, Inc.*, 638 F.2d 790 (5th Cir.1981), where it had affirmed a summary judgment for the lessor holding that royalties for sulphur produced from sour gas were to be paid under the gas clause. The court in *Pursue I* held that *Taslog* was not controlling because it differed in three significant ways: (1) the *Taslog* lease had no specific royalty provision for "sulphur";

(2) the *Taslog* lease provided a royalty for gas that also included "other gaseous substance produced from the premises"; (3) the lessee in *Taslog* stipulated that industry practice supported payment for sulphur produced from sour gas under the gas clause, while in *Pursue*, the lessee contended that the industry had no consistent practice of paying for such sulphur under one clause or the other. *Pursue I,* 784 F.2d at 663–64. The court in *Pursue I* concluded that the ambiguity required further proceedings, so that extrinsic evidence could be admitted on industry practice, the parties' intent, and other such matters as would resolve the ambiguity.

We observe that the present lease contains a specific royalty for sulphur and does not mention "other gaseous substance." Furthermore, there is no stipulation or evidence that current industry practice is to pay one royalty or the other on hydrogen sulfide gas.[1] The present case thus resembles *Pursue* and differs from *Taslog.*

Approximately six months after its unanimous opinion in *Pursue I,* the panel withdrew that opinion and held the exact opposite. *Pursue II* followed *Taslog* and affirmed the summary judgment for the lessor. It held that the lease unambiguously required royalty payments under the gas clause for sulphur extracted from sour gas. The two judges who changed their minds to become the majority in *Pursue II* stated, "The first issue is *whether ... the lease* unambiguously *requires payment* under the gas clause ... *for hydrogen sulfide gas* from which sulphur is produced." 799 F.2d at 151 (emphasis supplied). The new majority found that *Taslog,* which was distinguished in *Pursue I,* provided "strong support" for the new result. The court explained its new holding as follows:

The hydrogen sulfide gas is 'gas ... produced from said land.' The sulphur extracted from the hydrogen sulfide gas is not sulphur that is 'mined.'

... No sulphur is 'mined' from the D'Lo Unit No. 1; rather, gas is produced and the sulphur is extracted from the gas.

799 F.2d at 151–52; *see also Piney Woods Country Life School v. Shell Oil Co.,* 726 F.2d 225, 229 n. 3 (5th Cir.1984) (dictum).

The dissenter, Judge Jolly, who authored *Pursue* I, disagreed regarding what question was presented for review. He stated:

The question that the parties have asked this court to decide is *not* how to pay for the *sour gas* extracted from the land, but rather how to pay for the *sulphur* extracted from the sour gas.

Having framed a different issue for decision than the majority, Judge Jolly answered it thus:

Since the product to be paid for is sulphur, and subsection (3)(c) explicitly provides for the payment of sulphur, I see no basis on its face for holding that the contract *unambiguously* requires that sulphur be paid for under subsection 3(b).

799 F.2d at 153 (emphasis in original).

◼ We agree with the majority in *Pursue II* that the leases require payment under the gas clause, section 3(b)(1).[2] Therefore, we hold that the trial court erred in granting summary judgment for the lessor and in holding that payment should be made under the sulphur clause, section 3(c).

We are not convinced that sulphur extracted from hydrogen sulfide gas has been "mined" within the meaning of section 3(c). While it has been held that, at least in some circumstances, a gas well is a "mine," *Southland Royalty Co. v. Pan American*

---

**1.** The affidavit of appellee's agent, Hinson, states that *sales* by appellee of *elemental sulphur* produced from appellant's lands have been on a price basis of a posted dollar amount per ton sold and that that is the "historical and industrywide basis on which elemental sulphur has been and is sold." This case, however, does not involve sales of elemental sulphur. It involves purchases of hydrogen sulfide gas from which sulphur is extracted. The record is silent regarding the price basis, in current industry prac-

tice and under similarly phrased contracts, for purchasing hydrogen sulfide gas.

**2.** We recognize that in *Pursue II,* the lessor recovered under section 3(b)(2), not under section 3(b)(1). This, we presume, was because the lessee there was also the processor of the gas, unlike the present case. This distinction does not lead us to a different result.

*Petroleum Corp.*, 378 S.W.2d 50, 56 (Tex. 1964); *see also Amoco Production Co. v. Guild Trust*, 636 F.2d 261 (10th Cir.1980) (applying Wyoming law), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), these cases did not involve the production of sulphur from hydrogen sulfide gas. We are unwilling to extend the holding in *Southland Royalty* to the facts of this case in light of the rule that mineral leases are strictly construed in favor of the lessor. *Compare Lone Star Gas Co. v. Stine*, 41 S.W.2d 48, 49 (Tex.Comm.App. 1931) (judgmt. adopted).

We recognize that the result that any court reaches on this difficult issue will be determined by how the question for decision is posed. The differences are starkly shown by the majority in *Pursue II* ("whether royalties for *hydrogen sulfide gas* from which sulphur is extracted shall be paid for under the gas clause rather than under the sulphur clause") and by the dissenter ("how to pay for the *sulphur* extracted from the sour gas").

We conclude that hydrogen sulfide gas is "gas"; that it has value; that it is not "sulphur mined and marketed"; and that it is not treated differently from any other gas by this lease. Therefore, as in *Pursue II* and *Taslog*, it should be paid for under the gas clause.

The point of error is sustained.

The judgment is reversed, and the cause is remanded to the district court.

DUNN, J., concurring.

SAM BASS, J., dissenting.

DUNN, Justice, concurring

I agree that the summary judgment should be reversed. However, I would hold that the leases are ambiguous, not that payment is required as a matter of law under the gas clause, section 3(b)(1).

I am unwilling to deny either side a trial, based on this ambiguous language that has confounded three able federal judges, as well as three members of this panel, and that presents an important question of first impression in Texas. I cannot declare with confidence, based on this record, that there is no disputed issue of fact and that one side or the other is entitled to judgment as a matter of law.

A motion for summary judgment should be denied when the court is of the opinion that the particular controversy is such that the public interest is involved, and is better served by a full development of the evidence at trial. Summary procedures present a treacherous record for deciding issues of far-flung import, such as this. 4 R. McDonald, *Texas Civil Practice in District and County Courts*, § 17.26.12 (rev. 1984). Therefore, I would hold that the lease is ambiguous; that the ambiguity has not been resolved by clear summary judgment evidence; and that the present record does not allow us to determine which clause controls.

I concur.

SAM BASS, Justice, dissenting.

I disagree with the members of the majority. I would affirm the summary judgment and hold that sulphur extracted from hydrogen sulfide gas should be paid for by appellee under the sulphur clause of the lease, section 3(c).

The present leases should be construed as a whole, not by a review of isolated parts. Each of these identical leases repeatedly mentions sulphur as a separate mineral in several different places, so as to distinguish it from oil, gas, and "all other minerals." The most striking provision is the sulphur royalty clause, section 3(c), quoted above. However, "sulphur" is separately mentioned in three other places (the granting clause of paragraph one, the savings clause of paragraph six, and the proportionate reduction clause, paragraph ten) and is incorporated by reference to "operations" in another (the savings clause of paragraph six). While only the royalty clause, section 3, appears to treat sulphur differently from the other listed minerals, the repeated reference to "sulphur" indicates the parties' understanding that sulphur is not the same thing as "oil," "gas," or "other minerals." Hudrogen sulfide gas by contrast, is not mentioned in the lease.

From this, I would conclude that the specific mention and different treatment of sulphur in the royalty clause should control over any general reference to "gas" that might otherwise inferentially include it. Therefore, I would hold that the specific royalty provision for sulphur in paragraph 3(c) should control, not the general royalty provision for "gas" in paragraph 3(b)(1).

All parties contend that the leases are not ambiguous. If, as Judge Dunn argues in her concurring opinion, the leases are ambiguous, I would hold that the summary judgment evidence in this record resolves the ambiguity. In *Taslog*, 638 F.2d at 795–96, the court considered summary judgment evidence concerning industry practice, even though it held that the lease was not ambiguous. Appellee's summary judgment evidence included the affidavit of James Hinson, its vice-president and secretary, that:

> Since 1984, the date of first production from the leases on lands pooled therewith (that is, from the Units), all sales of sulphur by Prairie from the Leases and lands pooled therewith have been of elemental sulphur (S) on a price basis of a given posted dollar amount per ton sold. This is the historical and industry-wide basis on which elemental sulphur (S) has been and is sold. Elemental sulphur (S) is traditionally sold in solid form or, in some instances as with Prairie's elemental sulphur (S), sold while still in molten form, both instances being sales by the ton.

Hinson's affidavit establishes that current and historic industry practice is for buyers to pay for sulphur extracted from hydrogen sulfide gas in the manner provided by sub-section 3(c), the sulphur clause, and that that practice has been followed by appellee when conducting its operations under these leases. Appellants have pointed out no summary judgment evidence to the contrary. Hinson's affidavit distinguishes this case from *Taslog*, where the parties stipulated to the opposite, and from *Pursue*, where the evidence denied the existence of any consistent industry practice. *See Pursue I*, 784 F.2d at 664.

The undisputed summary judgment evidence in this case showed that hydrogen sulfide gas had no market value at the well-head in that form. Its sole value was based upon the amount of sulphur (and other components) that could be extracted from it. Since sulphur is what makes this hydrogen sulfide gas valuable, I would answer the question posed by Judge Jolly, the dissenter in *Pursue II*, and hold that sulphur, not hydrogen sulfide gas, should be paid for, and that it should be paid for under the sulphur clause, section 3(c). I would, therefore, affirm the summary judgment.

I respectfully dissent.