799 F.2d 149
 FIRST NATIONAL BANK OF JACKSON, as Trustee of the Dr. J.E.
Wadlington Family Trust, Plaintiff-Appellee,
v.
PURSUE ENERGY CORPORATION, 3300 Corp. and Grace Petroleum
Corporation, Defendants-Appellants.
 No. 85-4291.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 2, 1986.
Rehearing and Rehearing En Banc Denied Oct. 7, 1986.
 
 Alex A. Alston, Jr., Janice Holly Parsons, Jackson, Miss., for Pursue Energy & Grace Corp.
 Thomas L. Kirkland, Jr., Jackson, Miss., for 3300 Corp.
 W. McDonald Nichols, Wise & Carter, J. Leray McNamara, Jackson, Miss., for plaintiff-appellee.
 John M. Grower, Brunini, Grantham, Grower & Hewes, William L. Smith, Jackson, Miss., for amicus curiae.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before THORNBERRY, RUBIN and JOLLY, Circuit Judges.
 ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 (Opinion March 12, 1986, 5th Cir.1986, 784 F.2d 659)
 PER CURIAM:
 
 
 1
 Appellee First National Bank of Jackson, joined by Amicus,[1] has petitioned for rehearing of this Court's decision dated March 12, 1986. First National Bank of Jackson v. Pursue Energy Corp., 784 F.2d 659 (5th Cir.1986). The motion for rehearing is GRANTED, our previous decision is withdrawn, and the following decision is substituted.
 
 
 2
 The principal issue in this case is whether the district court properly held, on motion for summary judgment, that the oil, gas, and mineral lease at issue unambiguously requires that the lessor pay royalties for hydrogen sulphide gas from which sulphur is extracted under the gas clause rather than under the sulphur clause. We affirm the district court on this point and hold further that the lease requires the lessor to pay for the hydrogen sulphide gas under subclause (b)(2) of the gas clause, which applies to gas "used ... in the manufacture of gasoline or other products." We remand to the district court to determine the market value at the wellhead of hydrogen sulphide gas. Finally, we affirm the district court's holding that Miss.Code Ann. Sec. 53-3-39 (Supp.1985) governs the assessment of prejudgment interest against appellants.
 
 I.
 
 3
 Dr. J.E. Wadlington executed the oil, gas, and mineral lease at issue in this case in 1975. The lease covers 310 acres of land in Rankin County, Mississippi. In 1980 Dr. Wadlington transferred his interest in the property, including his royalty interests, to the First National Bank of Jackson as trustee of the Dr. J.E. Wadlington Family Trust. The working interest in the lease passed through a series of conveyances to appellants Pursue Energy Corporation (50%), 3300 Corporation (25%), and Grace Petroleum Corporation (25%).
 
 
 4
 In 1978 the Mississippi Oil and Gas Board granted Pursue a permit to drill a well designated as the D'Lo Royalties Unit No. 1. The Unit includes the property covered by the Wadlington lease. The well began production in October 1978, with Pursue as operator and Grace and 3300 as working interest owners.
 
 
 5
 The well produces sour gas. Sour gas contains a large amount of hydrogen sulphide, a highly toxic non-hydrocarbon gas. The sour gas cannot be used as it comes out of the well. Instead, it is delivered to a processing plant, where the carbon dioxide and hydrogen sulphide are removed from the gas stream. The residue gas is sold under contract to the Southern Natural Gas Company. The hydrogen sulphide gas is processed further into sulphur and sold at an agreed price per long ton.
 
 
 6
 In 1981 Pursue sent the Bank a division order notifying it that payments for sulphur would be made under the lease's sulphur royalty clause, rather than under the gas clause. The Bank refused to sign the division order, insisting that the gas clause applied. The Bank filed suit in 1983 against Pursue, 3300 Corp., and Grace. The district court granted the Bank's motion for summary judgment, holding on the basis of Scott Paper Co. v. Taslog, 638 F.2d 790 (5th Cir.1981), that the lease unambiguously required payment under the gas clause for hydrogen sulphide gas from which sulphur is produced. The district court also awarded the Bank prejudgment interest on royalties accruing after July 1, 1983, the effective date of Miss.Code Ann. Sec. 53-3-39 (Supp.1985). Pursuant to an accounting prepared by the appellants, the district court entered a final judgment in favor of the Bank for $80,852.65. Pursue, 3300 Corp., and Grace appeal.
 
 II.
 
 7
 A. Sulphur Clause or Gas Clause?
 
 
 8
 The first issue is whether the district court erred in holding that the lease unambiguously requires payment under the gas clause of the lease for hydrogen sulphide gas from which sulphur is produced. Our analysis is governed by principles of contract law. An unambiguous contract is interpreted as a matter of law. Interpretation of an ambiguous contract through extrinsic evidence of the parties' intent is a matter of fact. A district court may grant summary judgment when a contract is unambiguous, but may not do so when the contract is ambiguous and the parties' intent presents a genuine issue of material fact. Southern Natural Gas Co. v. Pursue Energy, 781 F.2d 1079, 1081 (5th Cir.1986). Under Mississippi law, the ambiguity of a contract is determined by examining the language of the instrument. See Pfisterer v. Noble, 320 So.2d 383, 384 (Miss.1975). The district court's determination that a contract is unambiguous is a conclusion of law that we review de novo. Southern Natural Gas, 781 F.2d at 1081; Fed.R.Civ.P. 52(a).
 
 
 9
 The royalty provisions in the Wadlington lease state:
 
 
 10
 3. As royalty, lessee covenants and agrees: ... (b) To pay lessor on gas and casinghead gas produced from said land (1) when sold by lessee, one-eighth of the amount realized by lessee, computed at the mouth of the well, or (2) when used by lessee off said land or in the manufacture of gasoline or other products, the market value, at the mouth of the well, of one-eighth of such gas and casinghead gas; (c) To pay lessor on all other minerals mined and marketed or utilized by lessee from said land, one-tenth either in kind or value at the well or mine at lessee's election, except that on sulphur mined and marketed the royalty shall be one dollar ($1.00) per long ton.
 
 
 11
 We conclude that this provision unambiguously requires Pursue to pay for hydrogen sulphide gas under the gas clause, p 3(b), rather than under the sulphur clause, p 3(c). The hydrogen sulphide gas is "gas ... produced from said land." The sulphur extracted from the hydrogen sulphide gas is not sulphur that is "mined."
 
 
 12
 Our conclusion is bolstered by the analysis in Scott Paper Co. v. Taslog, 638 F.2d 790 (5th Cir.1981). Scott Paper involved two sets of leases, the "Stanolind leases" and the "Royalty Dividend Deeds." To interpret the latter, the court had first to interpret the former. The Stanolind leases contained a gas royalty provision for "gas including casinghead gas or other gaseous substance, produced from said land," id. at 792, and a sulphur royalty provision for "sulphur produced and marketed from the land," id. The court concluded that the Stanolind leases unambiguously required that royalties on hydrogen sulphide gas from which sulphur was extracted be paid under the gas clause. See id. at 795-96. The court noted that "no elemental sulphur is 'produced from the land.' Instead, the sulphur is produced from the gas that is produced from the land." Id. at 796 (emphasis in original). So it is here. No sulphur is "mined" from D'Lo Unit No. 1; rather, gas is produced and the sulphur is extracted from the gas.
 
 
 13
 Scott Paper is distinguishable from our case in two principal respects: First, the gas clause in the Stanolind lease was broader than that in the Wadlington lease, applying not only to "gas including casinghead gas," but also to "other gaseous substance[s]." Id. at 792. Second, unlike in this case, it was undisputed in Scott Paper that industry practice was to pay gas royalties and not sulphur royalties on hydrogen sulphide gas. Id. at 795. In light of these distinctions, we cannot say that Scott Paper requires the result that we reach. The case does, however, provide strong support for the conclusion that we draw from our examination of the Wadlington lease. Cf. Piney Woods Country Life School v. Shell Oil Co., 726 F.2d 225, 229 n. 3 (5th Cir.1984) (dictum; discussing lease provision identical to Wadlington royalty provision, court notes that "[i]t is clear, and Shell does not contest, that the royalty for elemental sulphur produced from sour gas is covered by the gas royalty clause rather than the clauses providing for royalties on 'mined' minerals," citing Scott Paper ), cert. denied, 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985).
 
 
 14
 We hold that p 3(b) of the Wadlington lease unambiguously governs the royalty to be paid on hydrogen sulphide gas from which sulphur is extracted.
 
 
 15
 B. Subclause 3(b)(1) or 3(b)(2) ?
 
 
 16
 On rehearing the question has arisen whether p 3(b)(1) or p 3(b)(2) governs the payment of royalties on hydrogen sulphide gas. We conclude that p 3(b)(2) unambiguously controls.[2] The hydrogen sulphide gas is not "sold by lessee"; rather, it is "used by lessee ... in the manufacture of ... other products," namely sulphur.
 
 
 17
 Pursue contends that the word "products" in p 3(b)(2) does not include sulphur extracted from hydrogen sulphide gas. We disagree. The usual meaning of the word "product" is "[g]oods produced or manufactured, either by natural means, by hand, or with tools, machinery, chemicals, or the like." Black's Law Dictionary 1088 (5th ed. 1979). Sulphur extracted from hydrogen sulphide gas plainly falls within this definition. Pursue counters that sulphur does not fall within the definition of "product" contained in the Mississippi Code's oil and gas provisions. The Code defines "product" as follows: " 'Product' shall mean any commodity made from oil or gas, and shall include" a list of substances, of which sulphur is not one. Miss.Code Ann. Sec. 53-1-3(i) (Supp.1985) (emphasis added). Because sulphur is not on the list, Pursue contends that it is not a "product." But the word "any," emphasized in the quoted language, makes clear that the list is not intended to be exhaustive.
 
 
 18
 Subclause 3(b)(2) requires payment of a royalty based on "the market value, at the mouth of the well, of one-eighth" of the hydrogen sulphide gas. We must remand to the district court to determine the wellhead market value of the hydrogen sulphide gas during the time period with which this case is concerned. We hope that the parties can reach agreement on this point. If they cannot, then the district court must make the determination. Without intending to fetter the district court's appropriate discretion in this matter, we commend to its attention the discussion in Scott Paper, 638 F.2d at 797-99. The Scott Paper court considered the method of determining the "market price at the well" of hydrogen sulphide gas from which sulphur is extracted. Id. at 797. Although the court noted that the gas did not have an available market, it affirmed the district court's conclusion that the wellhead market value could be determined by deducting the cost of transmission and processing from the sales revenue of the sulphur produced from the gas. See id. at 797, 799. If the parties cannot agree and the district court does not discover a more appropriate method of determining the market value of the hydrogen sulphide gas, then we suggest that it apply the Scott Paper approach.[3]
 
 C. Pre-judgment Interest
 
 19
 The district court assessed prejudgment interest against Pursue, 3300 Corp., and Grace at the 8% annual rate provided in Miss.Code Ann. Sec. 53-3-39, computed from July 1, 1983, the effective date of the statute. 3300 Corp.[4] contends that the district court erred in awarding prejudgment interest under Sec. 53-3-39. In view of the likelihood that the district court will find on remand that the appellants owe the Bank additional royalties, we consider this issue.
 
 Section 53-3-39 provides:
 
 20
 Purchasers of oil or gas production from any oil or gas well shall be liable for the payment of interest on royalty proceeds which have not been disbursed to the royalty owners from and after one hundred twenty (120) days following the date of the first sale of oil or gas.
 
 
 21
 The rate of interest shall be eight percent (8%) per annum and shall be computed from the date of one hundred twenty (120) days after such first sale.
 
 
 22
 Miss.Code Ann. Sec. 53-3-39 (Supp.1985). The language of this provision seems plainly applicable to our case. Since 1981 Pursue, 3300 Corp., and Grace have not disbursed to the Bank the difference, if any, between the royalties payable on sulphur under p 3(c) and those payable on hydrogen sulphide gas under p 3(b)(2). In such a case, the statute provides unequivocally that purchasers "shall be liable" for prejudgment interest at an 8% annual rate.
 
 
 23
 3300 Corp. contends that Sec. 53-3-39 does not abrogate the Mississippi common law rule that prejudgment interest should be allowed only if the defendant denied the plaintiff's claim frivolously or in bad faith. See Glantz Contracting Co. v. General Electric Co., 379 So.2d 912, 918 (Miss.1980); Home Insurance Co. v. Olmstead, 355 So.2d 310, 314 (Miss.1978); cf. Piney Woods, 726 F.2d at 242 (denying prejudgment interest under Mississippi common law in absence of bad faith). 3300 Corp. argues that it cannot be assessed prejudgment interest because no showing was made that it acted in bad faith or frivolously in paying under the sulphur clause.
 
 
 24
 The short and conclusive answer to 3300's argument is that Sec. 53-3-39 contains no bad faith requirement. The statute simply provides that purchasers "shall be liable" for prejudgment interest on royalties not disbursed. The common law rule may prevail in the absence of a statute, but where the Mississippi legislature has expressed a contrary view, the common law must yield. See Stanton & Associates v. Bryant Construction Co., 464 So.2d 499, 502 (Miss.1985) (noting that "in the absence of statute or contract providing expressly therefor, or proof sufficient to support an award of punitive damages, there can be no recovery of attorneys fees or prejudgment interest" (emphasis added)); cf. McCluskey v. Thompson, 363 So.2d 256, 261-64 (Miss.1978) (rejecting doctrine that statutes in derogation of the common law must be narrowly construed). We hold that Sec. 53-3-39 applies regardless of whether the purchaser has acted in bad faith or frivolously. We affirm the district court's conclusion that Sec. 53-3-39 applies to this case for all amounts owed to the Bank by Pursue, 3300 Corp., and Grace from and after July 1, 1983.
 
 III.
 
 25
 We hold that p 3(b)(2) of the Wadlington lease unambiguously controls the payment of royalties on hydrogen sulphide gas from which sulphur is extracted. We hold further that Miss.Code Ann. Sec. 53-3-39 (Supp.1985) governs the assessment of prejudgment interest against Pursue, 3300 Corp., and Grace. We remand to the district court to determine the market value at the wellhead of hydrogen sulphide gas during the time period involved in this case. Unless the district court finds that the appellants' earlier accounting properly reflected the gas's market value, it must also compute the damages, if any, owed by the appellants to the Bank, including prejudgment interest.
 
 
 26
 The judgment of the district court is AFFIRMED and the case is REMANDED for proceedings consistent with this opinion.
 
 EDITH GRADY JOLLY, Circuit Judge, dissenting:
 
 27
 My brothers now claim, after reading several sets of briefs, listening to oral argument, reading several sets of additional briefs, discoursing among ourselves over several months, examining and reexamining the very few key words of the contract over several months, and after decisions and revisions to decisions, that they have seen the light. I do not question that they have seen the light, but it seems appropriate to observe that the light has been a long time coming if the contract is as unambiguous as they belatedly contend that it is.
 
 
 28
 As far as I can tell, and certainly as far the majority opinion reveals, we have no information before us revealing the economic consequences of choosing between subsections 3(b)(1) and 3(b)(2), or for that matter, between subsection 3(b) or 3(c). This factor seems important in understanding the proper application of the contract terms. The majority appears to assume that the substance removed from the ground is neither gas nor casinghead gas, but rather is a gaseous substance. That gaseous substance, however, does not have any "market value," as that term is used in subsection 3(b), because that subsection applies only to payment for "such gas" at the "mouth of the well," not to payment for the manufactured products. On the majority's assumption that the gaseous substance is neither gas nor casinghead gas, it has no market value, precluding application of subsection 3(b)(2).
 
 
 29
 The majority appears to argue that clause (b)(2) applies because the sour gas is "used by lessee ... in the manufacture of ... other products...." Apparently, the "other products" is elemental sulphur. The lease, however, is ambiguous on whether the process of making sulphur from sour gas is what is contemplated by the clause "manufacture of other products." Indeed, it would seem under the majority's construction of the contract terms that both gas and sulphur are "manufactured" from a gaseous substance, which is a plausible view. If this is the case, however, subsection 3(b)(2) expressly would not be applicable since no "gas" would be produced at the mouth of the well.
 
 
 30
 I concede that the majority's argument supporting application of 3(b) is plausible; unfortunately, I also find plausible the producer's arguments that subsection 3(c) applies. The question that the parties have asked this court to decide is not how to pay for the sour gas extracted from the land, but rather how to pay for the sulphur extracted from the sour gas. Since the product to be paid for is sulphur, and subsection 3(c) explicitly provides for the payment of sulphur, I see no basis on its face for holding that the contract unambiguously requires that sulphur be paid for under subsection 3(b).
 
 
 31
 It seems clear to me that this contract does not contemplate payment for sour gas, or otherwise it would have been clear as to how such payment would be made. Contract terms that do not contemplate a given event, but rather specifically apply to situations that are not present, are unlikely to evince an unambiguous intent that does not require further explanation such as industry practice and industry definition and understanding of terms. Nonetheless, the majority seems determined to make assumptions (with substantial economic consequences) on a bare record.
 
 
 32
 In addition, the majority, without citation, without explanation, indeed, without "notation," proclaims, contrary to the Tenth Circuit in Amoco Production Co. v. Guild Trust, 636 F.2d 261 (10th Cir.1980) (applying Wyoming law), that sulphur removed from gas is not mined. An issue of this import, especially one that is controlled by state law and one on which many states differ, deserves more consideration than the majority gives.
 
 
 33
 Once we move beyond the ambiguous language of this contract, there is substantial evidence that numerous lessors have renegotiated their contracts to achieve the result desired by the majority, i.e., that subsection 3(b) applies. We should not, however, by judicial interpretation, effect a modification of the intended and negotiated economic benefits of the contract.
 
 
 34
 I therefore respectfully dissent on the grounds that this contract has been ambiguous to me since I first picked it up many months ago. As I read it at this moment, it remains ambiguous. The clairvoyance that has suddenly descended upon my brethren after eight months' cogitation has somehow eluded me. While the majority's arguments are certainly plausible, it seems unwise to affirm on summary judgment when this court does not have a certain picture of the economic and other consequences of its decision. The majority rejects the road to such enlightenment. I believe that a decision enlightened by a fully developed record would render a wiser, surer result. Thus, I continue to adhere to the panel's original position that the contract does not unambiguously require either subsection 3(b) or 3(c) to be applied in the instant case, that summary judgment was improperly granted, and that the case should be remanded for trial.
 
 
 
 [1]
 The court granted the motion of Fannie Elizabeth Whitworth Payne for leave to file a brief amicus curiae in support of the Bank's petition for rehearing and suggestion for rehearing en banc
 
 
 [2]
 We express no opinion as to which subclause--p 3(b)(1) or p 3(b)(2)--controls the payment of royalties on residue gas
 
 
 [3]
 We note that the appellants used an approach similar to that approved in Scott Paper in computing the additional royalties owed to the Bank. See Accounting Pursuant to Order of Court Dated October 23, 1984, Exhibit A (Rec. 622-23). The appellants determined the gross revenue that they had received each month from the sale of sulphur extracted from hydrogen sulphide gas. From that sum they deducted processing charges and severance taxes to obtain net revenue. Finally, the appellants computed the Bank's fractional share of the net revenue. If the district court determines this to be a proper method of computing the wellhead market value of the hydrogen sulphide gas, then it may avoid a second accounting
 
 
 [4]
 Neither Pursue nor Grace appeals the district court's assessment of prejudgment interest