**CENTRAL LOUISIANA ELECTRIC COMPANY, INC. and Southwestern Electric Power Company**

v.

**The DOLET HILLS MINING VENTURE, Mining Beteiligungs–GmbH & Co. KG, and Mansfield Mining Company**

No. Civ.A. 97–0728.

United States District Court, W.D. Louisiana, Shreveport Division.

June 3, 1999.

**712**

David R. Taggart, David A. Barlow, Barlow and Hardtner, L.C., Shreveport, LA, for Plaintiffs.

Robert A. Burgoyne, Fulbright & Jaworski, L.L.P., Washinton, DC, F.Drake Lee, Jr., Albert M. Hand, Jr., Cook, Yancey, King & Galloway, Shreveport, LA, for Defendants.

## MEMORANDUM RULING

STAGG, District Judge.

Before the court are two motions for partial summary judgment. The first of these motions was filed by the plaintiffs, Central Louisiana Electric Company, Inc. ("CLECO") and Southwestern Electric Power Company ("SWEPCO") (hereinafter collectively referred to as "Project"). The second motion was filed by the defendants and counter-plaintiffs, Dolet Hills Mining Venture, a joint venture mining partnership whose partners consist of defendants Mining Beteiligungs–GmbH & Co. KG and Mansfield Mining Company (hereinafter collectively referred to as "DHMV" or "Miner"). Based on the following, Project's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART.** DHMV's motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART.**

### I. BACKGROUND

**A. Facts.**

Central Louisiana Electric Company, Inc. and Southwestern Electric Power Company agreed in 1978 to jointly develop Louisiana's abundant lignite reserves and construct a power plant. The companies pooled their resources and, after several years of studies and analyses, announced plans to build a 640,000 kilowatt lignite-fired electric generating plant at Dolet Hills.

Shortly thereafter, the Dolet Hills Mining Venture, jointly owned by The Costain Group PLC of England and Jones Group, Inc. of North Carolina, was contracted to mine and deliver lignite to the power plant. Mining lignite began in August 1985, and Louisiana lignite became a new source of electric energy.

The Dolet Hills Mining Venture recovers lignite by surface mining using a giant dragline to remove 20 to 140 feet of dirt and expose the lignite below. The dragline is as tall as a 20–story building. It weighs 8 million pounds and has a 77 cubic yard bucket. The

bucket holds enough dirt to fill a one-car garage.

 * * * * * *

Seams of lignite are uncovered by the dragline around the clock. Once exposed, the lignite, in layers 6–10 feet thick, is removed with a large backhoe and loaded into trucks. Each truck is capable of carrying 85 tons of lignite. After the lignite is removed, the dragline fills the pit with dirt from the next pit that is being excavated, helping to return the area to its original contour. Trucks filled with lignite haul to a central collection site, and they dump their loads at the beginning of a seven-mile conveyor belt for transport to the power plant. The conveyor belt travels 800 feet per minute and delivers 1000 tons of lignite to the plant every hour. The Louisiana fuel source provides the energy of 6 million barrels of crude oil each year.

Record Document 22, Ex. 7.

CLECO and SWEPCO are regulated public utilities engaged primarily in the business of generating and selling electricity to the public in the states of Louisiana, Arkansas and Texas. The Dolet Hills Power Plant is located near Mansfield, Louisiana ("the Plant"), and is fueled primarily by lignite reserves that are controlled or intended to be controlled by Project, either as lessee under mineral leases or as owner.[1] The unit was to be a mine-mouth unit to take advantage of the adjacent lignite reserves while avoiding the necessity of transporting the lignite

reserves any substantial distance from the point of extraction to the Plant.

Although Project planned to use the lignite as the primary fuel for the Plant, Project did not want to mine the lignite reserves. Instead, Project sought to contract with an independent contractor who would mine and deliver Project's lignite reserves to the Plant for a fee based on the number of tons of lignite nominated by Project. In 1981, Project invited various mining companies "to submit a proposal ... for a long-term lignite supply contract." The invitation for bids further advised that the power plant would "require approximately 2.5 million tons of lignite per year" when it reached its purported design capacity; that the mining company would mine and supply this lignite "on a base-price (escalated) basis;" that the "primary term of the agreement [would] be 25 years with provisions for extension;" and that the proposed "mine should be designed to accommodate expansion to approximately double the initial size to support generation by a second unit if CLECO/SWEPCO should decide to install a second unit at a later date." After lengthy negotiations with various potential contractors, Project and DHMV[2] entered into a long-term contract comprised of a Lignite Mining Agreement ("LMA"), together with exhibits and other specified documents (collectively the "Contract"), effective as of March 16, 1982, pursuant to which DHMV agreed to mine and deliver lignite.[3] The 1982 LMA is a

---

1. Before constructing the Plant, Project acquired ownership of, or the right to mine, *in situ* lignite reserves which would be the primary fuel source for the Plant. Project invested hundreds of millions of dollars in the design and construction of the Plant and in acquiring control of the reserves. In addition, because Project at that time anticipated the need for an additional unit to be constructed at a later time, Project acquired ownership of, or the right to mine, sufficient *in situ* lignite reserves to fuel a second unit.

2. At the time that the contract was awarded and until 1995, DHMV was a joint venture partnership whose partners consisted of Cos-

tain Mining (Dolet Hills), Inc., Costain Australia Mining Pty. Limited, and Mansfield Mining. In 1995, Mining Beteiligungs–GmbH & Co. KG (hereinafter referred to as "German Mining") and Mansfield Mining Company ("Mansfield Mining") purchased all of the partnership interests in DHMV held by Costain Mining (Dolet Hills), Inc. and Cosmin, Inc.

3. One of the delivery points is referred to as the "Plant Hopper." *See* Record Document 17, Ex. 1 at 3. The Plant Hopper is located at the end of DHMV's conveyor belt by which lignite is transported.

long-term supply contract and has been amended numerous times.[4] Initial commercial operation of the Plant occurred in April, 1986.

Although there is a base price paid for lignite mined by DHMV, the price may escalate depending on both the quantity and quality of the lignite. Certain costs incurred by DHMV are passed through to Project. DHMV has supplied lignite to Project under the LMA since 1985. Allocation of risk was expressly addressed by Project when it requested bids for the lignite supply contract: "[B]ids are to be proposed with the understanding that the Bidder will take the risk of production cost variability and Owners will take the risk of inflation."

**B. The Disputes.**

In the original set of agreements of March 16, 1982, there was an Option and Security Agreement described as necessary to assure Project of a solvent Miner over the projected 25 year life of the mining agreement. Article 5.3 required DHMV to make an initial equity investment from its own cash reserves of not less than $25,000,000, and to maintain a debt to equity ratio of not more than 2.8 to 1.

Following the change of ownership of DHMV (involving a purchase price of $75,-000,000), the Third Amendment to the Option and Security Agreement became effective. For the first time since mining began, the contract required from DHMV a monthly statement setting forth the cal-

culation of the debt to equity ratio "in such detail as reasonably required by PROJECT, certified by MINER's chief financial officer, subject to year-end audit adjustments." This provision became the subject of dispute. In addition, another dispute arose over the meaning of Section 24.2 of the LMA concerning the right of Project to vary delivery nominations and over the meaning of Article 22 of the LMA regarding Project's ability to inspect the books and records of DHMV.

**C. Procedural History.**

On April 15, 1997, Project filed suit in this court against DHMV, requesting, *inter alia*, a declaratory judgment regarding various aspects of the required debt to equity ratio and the avoided costs of production, and asserting claims for accounting and damages regarding insurance costs, excess sulphur variability and imprudent mining practices. *See* Record Document 1. On June 16, 1997, DHMV answered Project's complaint, denying any liability in connection therewith, and asserting various counterclaims against Project.[5] *See* Record Document 4.

On December 10, 1997, Project filed a motion for partial summary judgment, seeking summary judgment on five claims raised in their complaint. Specifically, Project contends that it is entitled to partial summary judgment interpreting the Contract to the effect that:

(1) The Contract obligates DHMV to maintain a specified debt to equity ratio;

4. The term of the LMA extends from March 16, 1982 to a point in time twenty-five (25) years from the date of initial operation of the Plant. *See* Record Document 17, Ex. 1 at 5.

5. In its counterclaim, DHMV requested: (1) a declaratory judgment regarding Project's tonnage obligations under the LMA; (2) damages for Project's failure to comply with its minimum annual tonnage obligations; (3) damages for Project's failure to perform its contract obligations in good faith; (4) a declaratory judgment regarding Section 24.2 of the LMA; (5) a declaratory judgment regarding Project's access to DHMV's records; (6)

damages and a declaratory judgment relating to costs of sulfur blending; (7) damages relating to avoidance costs; (8) a declaratory judgment relating to the calculation of the price for lignite from split seam; (9) a declaratory judgment regarding the debt to equity ratio; (10) a declaratory judgment regarding interference with operations; and (11) a declaratory judgment regarding Project's June 1997 allegations of a potential "major default" by DHMV. *See* Record Document 4. Many of these issues are also the subject of DHMV's and/or Project's motions for partial summary judgment.

(2) Any failure by DHMV to maintain the required debt to equity ratio is an event of "Major Default" under the Contract;

(3) Project has the right under the Contract to control the amount of lignite to be delivered by DHMV, even though Project has nominated a different amount to be delivered;

(4) Project has the right under the Contract to pay DHMV the nomination price less DHMV's avoided costs of production for nominated tons not taken by Project; and

(5) Project is entitled to review DHMV's books and records to ensure DHMV's compliance with its Contract obligations.

*See* Record Document 17 at 3–4. On January 16, 1997, DHMV filed an opposition to Project's motion for partial summary judgment, and on January 23, 1998, Project filed a reply. *See* Record Documents 30 and 32.

On December 22, 1997, DHMV filed a motion for partial summary judgment against Project regarding many of the same issues presented in Project's motion. Specifically, DHMV sought partial summary judgment on the following claims and counterclaims:

(1) Project's rights under the LMA to review DHMV's books and records;

(2) The proper interpretation of Section 24.2 of the LMA;

(3) The quantity of lignite that Project is required to purchase from DHMV under the LMA; and

(4) Project's purported right under the LMA to review DHMV's books and records if Project challenges DHMV's compliance with the LMA's debt to equity requirement, or if Project alleges a "Major Default" and then seeks to determine the "option price" of DHMV's assets under the parties' Option and Security Agreement.

*See* Record Document 22. On January 16, 1997, Project filed an opposition to DHMV's motion for partial summary judgment, and on February 4, 1998, DHMV filed a reply.[6] *See* Record Documents 28 and 43.[7]

## II. ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial." *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir.1995). If the movant demonstrates the absence of a genuine issue of material fact, "the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* Where critical evidence is so weak or tenuous on an essential fact that it could not support a

---

**6.** On January 16, 1998, Project filed a motion to strike certain exhibits attached to DHMV's memorandum in support of its motion for partial summary judgment. *See* Record Document 26. On January 23, 1998, Project filed a second motion to strike concerning certain factual assertions set forth in DHMV's opposition to Project's motion for partial summary judgment as inadmissable unsubstantiated factual assertions. *See* Record Document 33.

Both of Project's motions to strike are **DE-NIED.** *See* attached order.

**7.** A preliminary injunction hearing took place on February 11, 1999, through February 12, 1999. The hearing included, among other issues, many of the issues presented in the motions for partial summary judgment filed by Project and DHMV.

judgment in favor of the nonmovant, then summary judgment should be granted. *See Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir.1993). All of the issues raised in the parties' motions involve interpretation of a long-term mining contract, and thus are ripe for disposition by summary judgment. *See First Nat. Bank of Jackson v. Pursue Energy Corp.*, 799 F.2d 149, 151 (5th Cir.1986); *Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir.1986) (finding that the interpretation of an unambiguous contract is a matter of law and thus a district court may properly grant summary judgment when a contract is unambiguous).[8] The determination of whether a contract is ambiguous is a question of law. *See Carter v. BRMAP*, 591 So.2d 1184, 1188 (La.App. 1st Cir.1991); *Borden, Inc. v. Gulf States Utilities Company*, 543 So.2d 924 (La.App. 1st Cir.1989).

**B. Applicable Contract Law And Louisiana Civil Code Provisions.**

 The Louisiana Civil Code contains extensive provisions governing the interpretation and enforcement of contracts. The law regarding interpretation of contracts was neatly set forth in *Carter v. BRMAP*, 591 So.2d 1184, 1187–88 (La. App. 1st Cir.1991):

Contracts have the effect of law on the parties thereto and must be performed in good faith. La.C.C. art.1983. Interpretation of a contract is the determination of the common intent of the parties. La.C.C. art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La.C.C. art. 2046. Conversely, when the terms of a contract are susceptible to more than one interpretation, it is ambiguous and parol evidence may be used to show the true intent of the parties and various rules of interpretation become applica-

ble. La.C.C. arts.2045 *et seq.; Dixie Campers, Inc. v. Vesely Company*, 398 So.2d 1087 (La.1981). Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La.C.C. art.2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La.C.C. art.2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La.C.C. art.2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La.C.C. art.2053. In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation; however, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. La.C.C. art. 2057. *See Myers v. Myers*, 532 So.2d 490 (La.App. 1st Cir.1988).

The court in *Investors Associates Ltd. v. B.F. Trappey's Sons Inc.*, 500 So.2d 909, 912 (La.App. 3d Cir.1987) stated:

The aim of contract interpretation is the discernment of a compatible meaning to all provisions of an agreement. Louisiana contracts are to be interpreted in light of the common intent of the parties, and in light of all of the provisions, so that each provision is given the meaning suggested by the contract as a whole. In ascertaining the common intentions of the parties to the contract,

8. *But see Lankford v. Koch Gateway Pipeline Co.*, 98–0719 (La.6/5/98), 713 So.2d 464, 466 (finding that because a contract amendment was susceptible of differing meanings, it was ambiguous and, consequently, the intended meaning was a contested issue of material fact precluding summary judgment).

recourse must first be obtained by construing the contract or agreement as a whole; if that process is not determinative, then the next subject of inquiry is the discernment of the circumstances surrounding the parties at the time of contracting. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.

(citations omitted). Parol evidence is generally inadmissible to vary the terms of a written contract unless the language regarding the common intention of the parties is ambiguous. A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation. *See Noel v. Discus Oil Corp.*, 30,561 (La.App. 2 Cir. 5/13/98), 714 So.2d 105, 109–10.

## C. Project's Motion For Partial Summary Judgment.

Project has asserted numerous claims in its motion for partial summary judgment. The court will consider each contention *seriatim.*

### 1. Project's Claims Regarding The Debt To Equity Ratio And A "Major Default."

■ Project asserts that the Contract obligates DHMV to maintain a specified debt to equity ratio and that any failure by DHMV to maintain the required ratio is an event of "major default" under the Contract. The court agrees. The contract language is clear and unambiguous as to this point. Specifically, section 20.7(b) of the LMA obligates Miner to maintain a

debt to equity ratio of not more than 2.8 to 1. Section 20.7(b) provides, in pertinent part:

> 20.7 Miner warrants, covenants and agrees:
>
> \* \* \* \* \* \*
>
> (b) That it will at all times during the term of this Agreement maintain a debt to equity ratio of not more than 2.8 to 1. . . .

Record Document 17, Ex. 1 at 16–17. Article 23 of the LMA addresses failure to perform and section (b)(1) of the article provides as follows:

> For the purposes of this Agreement, any one of the following events is a Major Default of Miner:
>
> (b)(1) Miner fails to perform any of its obligations under paragraph 20.7 . . . . and any such failure under (1) . . . above continues unremedied for sixty (60) days after written notice thereof shall have been given to Miner by Project.

Record Document 17, Ex. 1 at 17–18. A "Major Default of Miner" triggers Project's right to exercise various rights under an Option and Security Agreement attached to the LMA as Exhibit F, as amended by the Third Amendment To Option And Security Agreement. The parties clearly and unambiguously expressed their common intent that DHMV must not exceed the debt to equity ratio specified in Section 20.7(b) of the LMA and Section 5.3 of the Option and Security Agreement. Accordingly, in compliance with the provisions of the LMA, Miner is obligated to maintain the requisite debt to equity ratio and, in the event that Miner does not maintain the required debt to equity ratio, if the notice provisions of Article 23(b) are separately complied with, Miner is in major default.[9] Therefore, Project's motion

---

9. During the preliminary injunction hearing, one of the issues before the court included whether DHMV was currently in major default. This ruling does not encompass that question, rather it only determines that DHMV is required to comply with the debt to equity requirement and that, if the notice provisions of Article 23(b) are complied with, the failure of DHMV to show a 2.8 to 1 ratio results in a major default. The determination of whether DHMV is currently in default will be addressed in the ruling regarding the preliminary injunction.

for partial summary judgment is **GRANTED** in relation to this request.

## 2. Interpretation Of Section 24.2 Of The LMA.

■ Next, Project asserts that it "has the right under the contract to control the amount of lignite to be delivered by Miner, even though Project has nominated a different amount to be delivered, and Project has the right under the contract to pay Miner the nomination price less Miner's avoided costs of production for nominated tons not taken by Project." Record Document 17 at 14. Project bases its argument on the language of Section 24.2 of the LMA, which provides, in pertinent part:

> If Miner is at any time unable to deliver the contracted quantity of lignite required under this Agreement due to negligence, acts or omissions of Project (other than Force Majeure of Project under Article 16), then Miner (provided such negligence, acts or omissions of Project were not solely or jointly caused by negligence, acts or omissions of Miner, Governmental Authorities or any other third party) shall only be entitled:
>
> (a) To deliver such reduced quantities.
>
> (b) To be paid by Project as if the full quantity of lignite required under this contract had been delivered minus those costs of production not incurred by Miner as a result of such reduced quantity.

Record Document 17, Ex. 1 at 21. Relying on the language of Section 24.2, Project, therefore, argues that it has the right "to reduce the tons of lignite to be delivered ... below nominated amounts, in exchange for a payment of a price for the lignite not delivered that excludes Miner's avoided costs of delivering that lignite." Record Document 17 at 15–16. Project further argues that Section 24.2 "reflects the parties' understanding that, although Project agreed to nominate the annual tonnage as much as a year or more in advance, Project must be able to adjust the amount of lignite delivered by Miner under the LMA during the year." *Id.* at 16.

Section 24.2, by its terms, does not apply to either events of force majeure or to situations in which DHMV, third parties or regulatory agencies are the sole or joint cause of DHMV's inability to deliver lignite to Project. However, Project argues that it can trigger the application of Section 24.2 by refusing to allow DHMV to deliver nominated tons under the LMA. To support this argument, Project argues that under Sections 14.1 and 24.2 of the LMA, DHMV's obligation is an "alternative" one that can be satisfied in either of two ways. According to Project, DHMV must either (a) mine and deliver all lignite nominated by Project or (b) mine and deliver less than the quantity of lignite nominated by Project, as directed by Project. Project's reciprocal obligation is to either (a) pay DHMV the contract price for all lignite nominated by Project and delivered in accordance with the Contract or (b) pay DHMV as if the full nominated quantity of lignite had been delivered by DHMV, minus those costs of production not incurred by DHMV as a result of reductions in the quantity of lignite delivered that are due to Project's actions. *See* Record Document 17 at 16–17.

Under the Contract, DHMV is obligated to mine and deliver certain annual quantities of lignite. The LMA provides that the quantity of lignite to be mined and delivered to Project by DHMV during each calendar year beginning in 1987 shall be, unless adjusted pursuant to the LMA, within a range of 2.75 million tons to 2.375 million tons. *See* Record Document 17, Ex. 1 at 11, Sections 14.4 through 14.6. Under Section 10.1 of the LMA, Project pays DHMV the nominated price for each ton of lignite mined and delivered in accordance with the LMA up to the nominated amount.

Article 14 provides for a specified range of minimum and maximum annual purchases by Project and also requires Project to give DHMV at least twelve months notice and, in some instances, eighteen months notice, of the actual amount of

lignite that DHMV would be required to deliver each year. Furthermore, Article 14 allows DHMV to vary the actual deliveries by plus or minus two and one-half percent from the nominated amount:

14.5 Commencing on or before January 1, 1986, and thereafter no later than January 1 of each succeeding year during the term of this Agreement, Project shall notify Miner in writing of the quantity, within a range of 2.75 million tons to 2.375 million tons, to be delivered during the subsequent calendar year and an estimate of the quantity requirements during each of the four (4) calendar years thereafter.

14.6 Notwithstanding the provisions set out in paragraph 14.5 hereof, Miner shall be required to deliver an annual quantity of lignite in excess of 2.75 million tons (but not more than 3.25 million tons) or less than 2.375 million tons (but not less than 1.750 million tons), all as set forth in attached Exhibit "A," Part 3, upon Project's written notice to Miner, given at any time or times during the term of this Agreement at least eighteen (18) months in advance of delivery of such amount, of Project's desire to vary such maximum or minimum annual quantity.

14.7 Delivery of lignite by Miner may vary each year plus or minus two and one-half percent ($\pm$ 2 1/2%) of the annual nominated quantity. . . .

Record Document 17, Ex. 1 at 11. DHMV, therefore, argues that the tonnage nomination requirements imposed by Article 14 would be virtually meaningless if, pursuant to Section 24.2, Project could unilaterally reduce the amount of lignite required with little or no notice.[10] The court agrees.

Despite Project's assertions, this court does not believe that Section 24.2 was intended to subject DHMV to an "alternative performance" provision which would allow Project to meet its tonnage obligations by accepting as little or as much lignite as Project might decide, at any given time, to accept. Nor does this court find Project's interpretation of Section 24.2 to be reasonable. On the contrary, the unambiguous language of Section 24.2 was intended to protect DHMV in the event Project's "negligence, acts or omissions" should ever cause DHMV to be "unable" to deliver lignite. Only by ignoring both the clear and unambiguous language of Section 24.2 and the reciprocal obligations reflected in the LMA could one conclude that Section 24.2 provides an "important contractual right to Project." *See* Record Document 1, ¶ 30.

When the parties entered into the LMA, they assumed that the Dolet Hills Plant would burn approximately 2.5 million tons of lignite each year over the Plant's anticipated life.[11] They also recognized, however, that the Plant might burn more or less

---

**10.** To further support its position, DHMV relies on the negotiated pricing provisions found in Part 3 of Exhibit A to the LMA. Part 3 provides that the per ton price of lignite will increase if Project nominates less than 2.375 million tons of lignite for delivery in a given year:

If Project nominates an annual quantity of lignite less than 2.375 million tons pursuant to paragraph 14.6 of the Agreement and such quantity is delivered to Project, the Base Price shall be determined in accordance with the following sliding scale, and quantities falling between the stated fixed points will have a Base price at rates pro rata to the equivalent quoted rates:

| Annual Lignite Delivery Requirement | Base Price Per Ton |
| --- | --- |
| 2,374,999 tons | $13.59 |
| 2,250,000 tons | $14.17 |
| 2,125,000 tons | $14.85 |
| 2,000,000 tons | $15.60 |
| 1,875,000 tons | $16.46 |
| 1,750,000 tons | $17.17 |

Record Document 17, Ex. A, Part 3 (as amended in the First Amendment to the LMA).

**11.** Exhibit B to the LMA entitled "QUALITY AND QUANTITY REQUIREMENTS" indicates that, on average, Project will need, and DHMV will deliver, 2.5 million tons of lignite each year beginning with calendar year 1987 and extending through the last full year of the LMA's initial 25–year term.

lignite in a given year, and the LMA expressly reflects these assumptions. Article 14 of the LMA reflects the fact that Project's demands might either be higher or lower than the anticipated average of 2.5 million tons per year, stating that

DHMV acknowledges that the requirements and availability of the Plant and/or Project's Lignite Obligations to Others may require periodic adjustments for calendar year 1987 and each calendar year thereafter in the quantity of lignite to be delivered and in the delivery schedule set forth in attached Exhibit B....

Record Document 17, Ex. 1 at 11.

In language that is clear and unambiguous, Section 24.2 applies *only* "[i]f Miner is at any time unable to deliver the contracted quantity of lignite...." In addition to being at odds with Article 14 and with Section 24.2's unambiguous language, Project's interpretation would be inconsistent with the parties' clear intent to establish a stable and reliable supply relationship. Section 24.2 of the LMA is unambiguous, and a reading of the contract as a whole and in an effort to give meaning to each of the provisions results in a determination that Project may not control the amount of lignite to be delivered by DHMV, even though it has nominated a different amount to be delivered. DHMV's motion for partial summary judgment relating to the interpretation of Section 24.2 is **GRANTED.** Project may not rely upon Section 24.2 to reduce the amount of lignite to be delivered by DHMV.

### 3. Project's Right To Review DHMV's Books And Records.

Next, Project argues that "under the Contract Project is entitled to review Miner's books and records to ensure Miner's compliance with its contract obligations." Record Document 17 at 19. Project seeks to inspect DHMV's books and records in relation to, *inter alia:* the debt to equity ratio; the avoided costs of production; and the pricing terms of the LMA. Article 22 of the LMA, which is entitled "Auditing," provides, in pertinent part:

Miner shall **maintain** books and records, for at least a period of three (3) years, of all costs, payments, price revisions, adjustments, credits, debits and all other data relating to its operations hereunder **in order that the provisions of this Agreement and, more specifically, the provisions of attached Exhibit "A" can be adequately administered.**

At all reasonable times, upon written notice from Project, Miner shall make such records and books of account **as are needed to verify compliance with the pricing terms of this Agreement** available for inspection and audit. Such an audit may be conducted, at Project's option, subject to the following paragraphs, by (a) Project's internal audit staff, or (b) a nationally recognized firm of certified public accountants, to be selected by Project.

\* \* \* \* \* \*

Miner and Project shall each have the right at all reasonable times, upon written notice to the other, to examine the **records kept by the other of the weights and analysis of the lignite delivered hereunder.**

Record Document 17, Ex. 1 at 17 (emphasis added). An interpretation of Article 22, in addition to other relevant auditing provisions of the LMA, reveals the following:

#### (a) Weights And Analysis Of Lignite.

The LMA specifically provides that both Miner and Project have the "right at all reasonable times, upon written notice to the other, to examine the records kept by the other of the weights and analysis of the lignite delivered hereunder." Therefore, it is undisputable that Project is entitled to review Miner's records (as is Miner entitled to review Project's records) insofar as they relate specifically to "the weights and analysis of the lignite" and

provided that Project complies with the applicable notice provision.

**(b) Debt To Equity.**

In Section 1.1 of the Third Amendment to Option Agreement, DHMV agreed to furnish Project a monthly statement setting forth the calculation of the debt to equity ratio in such detail as reasonably required by Project, certified by Miner's chief financial officer, subject to year-end audit adjustments. The Agreement specifically provides that DHMV's compliance with the debt to equity requirement will be determined not by an audit of DHMV's books and records, but through the requirement of periodic statements. Project is not entitled to a review of DHMV's books and records to verify compliance with this ratio. However, DHMV is obligated to provide to Project the numbers from which it calculates its debt to equity ratio and to show Project specifically how it calculated the ratio. Once this calculation is made, the chief financial officer must certify to its accuracy. The certified statement which is currently being provided to Project unaccompanied by the supporting numbers, does not satisfy the terms of the Agreement.

**(c) Article 24.2.**

As set out in section two above, and in accordance with this court's interpretation of Article 24.2, there is no contractual right to demand "avoided costs of production." As previously discussed, Section 24.2(b) of the LMA only applies if Miner is unable to deliver lignite. However, assuming that circumstances arise whereupon Section 24.2 applies, Project acquires a right to pay Miner "as if the full quantity of lignite required under this contract had been delivered minus those costs of production not incurred by Miner as a result

of such reduced quantity." According to this provision, Project is entitled to a list of the "costs of production not incurred," however, this provision does *not*, as Project contends, entitle it, even upon its application, to a blanket review of DHMV's books and records.

**(d) Pricing Terms.**

Article 22 provides that "[a]t all reasonable times, upon written notice from Project, Miner shall make such records and books of account as are needed to verify compliance with the pricing terms of this Agreement available for inspection and audit." Although "pricing terms" is not one of the defined terms of the LMA, DHMV argues that this court should limit this term to the pass-through cost components of the adjusted base price of lignite delivered. This court agrees that Project is only entitled to review a certain category of books and records to verify DHMV's compliance with the LMA's pricing terms—those that relate to the costs that are direct pass-throughs under the LMA.[12]

Project has no right to review records of DHMV's actual costs with respect to those price adjustments that are not based upon DHMV's actual costs. The parties agreed to a base price per ton, which would then be periodically adjusted in accordance with the "inflation/deflation indices" specified in Table 1 of Exhibit "A." See Record Document 17, Ex. A, Parts 1 and 2. Table 1 of Exhibit "A" identifies nine cost components for which price adjustments are to be made based upon government indices or other external standards. Other price adjustments, however, are based upon DHMV's actual costs. If a price adjustment is based upon DHMV's actual costs, Article 22 gives Project the right to review

12. The Option and Security Agreement contains debt to equity ratio provisions and pricing provisions for the exercise of Project's option to purchase DHMV's interests in equipment owned or leased by DHMV and used to perform the LMA, if DHMV fails to maintain the specified debt to equity ratio. Project argues that "any provision of the LMA or its Exhibits which pertain to the 'price' payable by Project under any set of circumstances is a 'pricing term.'" Record Document 28 at 18. Project characterizes several provisions of the LMA as "pricing terms" and then argues that Project therefore has the right to review any DHMV records that relate to those provisions. The court disagrees.

those books and records relating to DHMV's corresponding actual costs as necessary to confirm the adjustment. However, if a given price adjustment is based upon a government index or other external standard, Project has no right to review information relating to DHMV's corresponding actual costs because the actual costs are not used in computing the price adjustment.[13]

To summarize, in relation to audit rights, Project is entitled: (1) to review DHMV's records regarding the weights and analysis of the lignite; (2) to receive a detailed periodic statement (including all numbers from which the ratio is calculated and the method of calculation) from DHMV regarding the calculation of the debt to equity ratio; (3) to receive a list of the "costs of production not incurred" if Article 24.2 is applicable; and (4) to review the books and records relating to DHMV's actual costs if a price adjustment is based upon DHMV's actual costs, as necessary to confirm the adjustment. Accordingly, Project's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART** insofar as it seeks a review of DHMV's books and records.

## C. DHMV's Motion For Partial Summary Judgment.

 DHMV has requested summary judgment on three issues of contract interpretation under the LMA, asking the court to determine: (1) Project's tonnage obligations under Article 14 of the LMA; (2) Project's alleged rights pursuant to Section 24.2 of the LMA; and (3) Project's rights under the LMA to review DHMV's books and records. *See* Record Document 43. Two of these issues were included in Project's motion for partial summary judgment and have been addressed *supra*. Accordingly, the only issue remaining from DHMV's motion for partial summary judg-

ment is Project's tonnage obligations. Specifically, DHMV has requested that the court enter a declaratory judgment which confirms the following interpretation of the LMA:

> If the Utilities' anticipated annual requirements at the Dolet Hills Plant fall within Article 14's base "range of 2.75 million tons to 2.375 million tons," the Utilities are obligated to meet all of those requirements by purchasing lignite from DHMV under the LMA. If the Utilities' anticipated annual requirements for a given year exceed 2.75 million tons, the Utilities are obligated to nominate and purchase at least 2.75 million tons from DHMV, and to give DHMV the opportunity to supply the extra tonnages above that amount up to 3.25 million tons of lignite per year ($\pm$ 2 1/2%), subject to the Utilities' deciding, in good faith, to accept the price proposed by DHMV for the extra tonnages. If the Utilities' anticipated fuel requirements are lower than 2.375 million tons, the Utilities must meet those requirements by purchasing lignite from DHMV and have the right to nominate as little as 1.75 million tons.

Record Document 22 at 21–22. In essence, DHMV contends that the LMA is a "requirements contract" that "requires [Project] to meet [its] full fuel requirements at the Dolet Hills Plant by purchasing lignite from DHMV." Record Document 22 at 15. Project maintains that the LMA is not a requirements contract.

Project nominated 2.75 million tons of lignite for 1987, 1988 and 1989. Since 1990, however, Project has nominated less than 2.75 million tons each year, even though it is alleged that the Plant burned in excess of 2.75 million tons of lignite in each of those years and that DHMV would have been able to deliver in excess of 2.75

---

13. Project's reliance on Parts 6(c) and 7(d) of Exhibit "A" to the LMA is misplaced, as Part 6 is expressly subject to Article 22. The provision allows access only to such "other data" as Project may "reasonably require." This language must be harmonized with the limit-

ed audit rights provided for in Article 22 of the LMA. Otherwise, Project would be able to request virtually any "data" that they wanted to request from DHMV and Article 22 would become mere surplusage.

million tons in each of those years with proper notice. Therefore, DHMV seeks a determination that Project is required to purchase these excess amounts from DHMV.

The relevant contractual provisions are set forth in Article 14 of the LMA, entitled "Lignite Delivery, Quantity, and Recovery." In pertinent part, Section 14.2 provides:

> The quantity of lignite to be mined and delivered to Project during the calendar year 1987, and each calendar year thereafter, shall be the quantity set out in attached Exhibit B for said calendar years; provided, however, that DHMV acknowledges that the requirements and availability of the Plant and/or Project's Lignite Obligations to Others may require periodic adjustments for calendar year 1987 and each calendar year thereafter in the quantity of lignite to be delivered and in the delivery schedule set forth in attached Exhibit B; provided rather that designation of such adjustment shall be accomplished in accordance with the provisions of paragraphs 14.5 and 14.6 hereof....

Record Document 17, Ex. 1 at 11. Exhibit B, in turn, provides that 2.5 million tons are to be delivered for each contract year beginning in 1987. Furthermore, Section 14.5 of the LMA states:

> 14.5 Commencing on or before January 1, 1986, and thereafter no later than January 1 of each succeeding year during the term of this Agreement, Project shall notify DHMV in writing of the quantity, within a range of 2.75 million tons to 2.375 million tons, to be delivered during the subsequent calendar year and an estimate of the quantity requirements during each of the four (4) calendar years thereafter.

Record Document 17, Ex. 1 at 11. Project argues that, based on the provisions of Section 14.2, the contract language indicates that if Project makes no nomination, the quantity of lignite to be delivered by DHMV under the LMA is 2.5 million tons per year, regardless of the actual fuel needs of the Dolet Hills Power Plant. As a result, Project surmises that the contract is not a requirements contract.

To make an adjustment in the tonnage nomination, Project has to give notice at least twelve months in advance of the contract year. As a result, twelve months before the contract year begins there is a fixed quantity of lignite that DHMV is obligated to deliver under the LMA—either 2.5 million tons or the amount from 2.375 to 2.75 million tons set forth in the notice. The contract, under this reading, is not affected by the fuel requirements of the Plant.

DHMV asserts that, subject to stated minimum and maximum annual tonnage amounts, the LMA requires Project to purchase, and DHMV to supply, the amount of lignite that Project anticipates needing each year at the Dolet Hills Plant. DHMV asserts that Project acknowledges that the Plant was built with the understanding that it would be "fueled by lignite from the abundant lignite reserves in De-Soto Parish, Louisiana," and that the Plant was designed, permitted and licensed based upon the assumption that it would burn lignite mined by DHMV from Project's reserves. *See* Record Document 1, ¶¶ 7 and 15. Furthermore, DHMV refers the court to the following sections of the LMA:

> WHEREAS, Project desires to build an electric power generating plant (hereinafter called the "Plant") ... to burn lignite from reserves owned by Project, ... and Project further desires to secure a long-term, reliable delivery of such lignite for such Plant or for other uses and to satisfy Project's obligations to supply lignite to others; and
> WHEREAS, DHMV represents that it has substantial coal and lignite surface mining experience and is willing to make the substantial investment of money, manpower and other resources needed to undertake permitting responsibilities, construct and operate the Mine, and mine and deliver that quantity and quali-

ty of lignite per year as provided herein to supply the needs of Project;

Record Document 17, Ex. 1 at 1. Additionally, DHMV argues that other provisions of the LMA also reflect Project's obligation "to look first to DHMV in meeting their fuel requirements at the Dolet Hills Plant" citing Section 9.1 of the LMA, which provides, in pertinent part:

DHMV shall submit for Project's approval not later than June 1, 1982, a life of mine plan sufficient to mine, produce and deliver to Project the specified quantity and quality of lignite so as ... **to satisfy all fuel requirements of the Plant,** the anticipated fuel requirements of the proposed second generating unit referred to in Article 28 ... and Project's lignite obligations to others....

Record Document 17, Ex. 1. at 7 (Section 9.1) (emphasis added); Record Document 22 at 17. Similarly, Section 28.1 of the LMA provides, in pertinent part:

Miner understands that all of the Dolet Hills Lignite Project Reserves have been or will be acquired by Project for the purpose of supplying lignite of the quantities and quality specified in this Agreement and are **expected to ultimately meet the lignite requirements of Project,** including, but not limited to, Project's Lignite to Others, **the fuel needs of the Plant** and a second generating unit, which second unit Project anticipates will not be required before 1990. In addition to the long term average of 2.5 million tons of lignite requirement for the Plant, the second generating unit (the "Second Unit") is anticipated to utilize over its work life an annual average quantity of an additional 2.5 million tons of lignite.... Therefore, at least three (3) months prior to January 1, of each year during the term of this Agreement, Project shall designate to Miner the annual quantity

of lignite in tons **required for the Plant....**

Record Document 17, Ex. 1 at 23 (Section 28.1) (emphasis added).

The contract does not specifically tie the tonnage obligations to the productivity of the Plant. However, the use of the words requirements and needs in the above quoted sections of the Contract would tend to negate Project's argument and support DHMV's theory that the Contract is a requirements contract because to accept Project's construction would be to give no effect to the word "requirements." This would be avoiding the plain meaning of such an expression that is well known in coal and other contracts for material. However, despite the use of the words "requirements" and "needs," the court finds that the parties' intent regarding whether or not the Contract is a requirements contract is not clear. As the court has concluded that provisions of the LMA regarding the tonnage obligations are ambiguous, DHMV's motion for partial summary judgment on this issue is **DENIED.** Because the Contract is susceptible of differing meanings, it is ambiguous and, consequently, the intended meaning is a contested issue of material fact precluding summary judgment. *See Lankford v. Koch Gateway Pipeline Co.,* 98–0719 (La.6/5/98), 713 So.2d 464, 466. As an ambiguity exists, the parties will be allowed to introduce parol evidence at trial regarding this issue.[14]

### *III. CONCLUSION*

After an exhaustive review of the record, particularly, the contract at issue, the court concludes the following;

Project's motion for partial summary judgment is **GRANTED** with respect to its request for a declaration regarding the

14. Project further argues that DHMV is estopped from arguing that the LMA is a requirements contract as a result of a 1995 settlement and compromise. According to article 3071 of the Louisiana Civil Code, neither the January 13, 1987 letter from DHMV's General Manager to Project nor the March 15, 1989 letter nor the January 13, 1995 letter from Mr. William Garnett constitute a transaction or compromise. Therefore, this argument is without merit.

debt to equity ratio and a determination of a "major default." Project's motion is **DENIED** with respect to its claim that it has the right under the Contract to control the amount of lignite to be delivered by DHMV, even though Project has nominated a different amount to be delivered. Project's motion is **GRANTED IN PART AND DENIED IN PART** with regard to the issue of whether it is entitled to review DHMV's books and records.

DHMV's motion for partial summary judgment is **DENIED** with respect to its request for a determination that the LMA is a requirements contract. DHMV's motion is **GRANTED IN PART AND DENIED IN PART** with respect to the determination of Project's rights to inspect and review DHMV's books and records. DHMV's motion is **GRANTED** with respect to the issue of whether or not Project has the right to reduce amounts under Section 24.2 of the LMA. Project cannot rely upon Section 24.2 to reduce the amount of lignite to be delivered by DHMV.

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

### *ORDER*

Based on the foregoing Memorandum Ruling;

**IT IS ORDERED** that Central Louisiana Electric Company, Inc.'s and Southwestern Electric Power Company's (hereinafter collectively referred to as "Project") motion for partial summary judgment (Record Document No. 17) is **GRANTED IN PART AND DENIED IN PART.** Project's motion is **GRANTED** with respect to its request for a declaration regarding the debt to equity ratio and a determination of what constitutes an event of "major default" under the Lignite Mining Agreement ("LMA"). The LMA requires Dolet Hills Mining Venture (hereinafter referred to as

"DHMV") to maintain a 2.8 to 1 debt to equity ratio and the failure to do so, after receiving proper notice, constitutes a major default.[1] Project's motion is **DENIED** with respect to its claim under Section 24.2 that it has the right under the LMA to control the amount of lignite to be delivered by DHMV, even though Project has nominated a different amount to be delivered. Project cannot rely upon Section 24.2 to reduce the amount of lignite to be delivered by DHMV. Project's motion is **GRANTED IN PART AND DENIED IN PART** with regard to the issue of whether it is entitled to review DHMV's books and records. In relation to the debt to equity ratio, Project is entitled to receive a detailed statement from DHMV which shall include the numbers used to calculate the ratio certified by the chief financial officer. Both Project and DHMV are entitled to examine the records of the other regarding the weights and analysis of the lignite. Finally, Project in entitled to review the books and records of DHMV in relation to DHMV's actual costs *if* a price adjustment is based upon DHMV's actual costs, as necessary to confirm the adjustment.

**IT IS FURTHER ORDERED** that DHMV's motion for partial summary judgment (Record Document No. 22) is **GRANTED IN PART AND DENIED IN PART.** DHMV's motion is **DENIED** with respect to its request for a determination that the LMA is a requirements contract as the LMA contains ambiguous language subject to further interpretation at trial. DHMV's motion is **GRANTED IN PART AND DENIED IN PART** with respect to the determination of Project's rights to inspect and review DHMV's books and records for the reasons listed above. DHMV's motion is **GRANTED** with respect to the issue of whether or not Project has the right to reduce amounts under Section 24.2 of the LMA.

1. As noted in footnote 9 of the attached memorandum ruling, this order does *not* encompass the issue of whether DHMV is in default, rather this ruling only *interprets* what constitutes a major default in relation to the debt to equity requirement.

IT IS FURTHER ORDERED that both of Project's motions to strike (Record Document Nos. 26 and 33) are DENIED.